THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiffs-Appellees, *v.* MORRIS CAMPBELL *et al.*, Defendants-Appellants.

(No. 70-197;

Fifth District—February 8, 1972.

John J. Hoban, of East St. Louis, and Harry E. Hartman, of Granite City, for appellants.

Robert H. Rice, State's Attorney, of Belleville, (Kenneth J. Juen, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

The defendants are trustees of the East Side Levee and Sanitary District of Madison and St. Clair Counties, a municipal corporation organized under Ill. Rev. Stat. 1969, ch. 42, par. 247. The defendants were convicted on five counts of official misconduct, in that they know-

ingly performed acts which they were forbidden by law to perform, and in that they intentionally failed to perform a mandatory duty required by law, in violation of Ill. Rev. Stat. 1969, ch. 38, par. 33—3(a) and (b). More specifically, the trustees were alleged to have authorized the payment of an amount in excess of $3500 to three attorneys in violation of ch. 42, par. 253, Ill. Rev. Stat., by Counts I, VI and VIII and to have entered into two contracts for the cleaning and repair of four tunnels under the levee without letting the contracts to the lowest responsible bidder and without giving due public notice, as provided by Section 269 of Chapter 42, by Counts IV and V. The trial court, sitting without a jury, found the defendants guilty, granted each defendant probation and included as a condition of probation a fine of $250 on each of the five counts and in addition ordered that each forfeit his office, pursuant to ch. 38, par. 33—3.

The defendants raise a number of issues on this appeal and those facts which are pertinent to the discussion of the issues will be raised when each issue is discussed. We do first, however, consider appellants' contentions that the trial court erred in not quashing those Counts of the indictment which alleged that the appellants knowingly performed an act which they were forbidden by law to perform, in that they authorized the payment of attorney fees in excess of $3500. The basis of the argument is that section 33—3(b) makes criminal, knowingly performing an act "which he knows is forbidden by law to perform", and that the indictments are fatally defective in not including this language.

■■ Knowledge that the defendants' acts knowingly performed "is forbidden by law" is an element of the offense described in par. 33—3(b) upon which Counts I, VI and VIII are based. These three counts of the indictment do not include the language *"which he knows* is forbidden by law to perform", (Italics ours), nor do they state anything which implies knowledge that the acts were forbidden by law. The indictments read "knowingly performed an act which they, and each of them, were forbidden by law to perform" but did not allege that defendants had any knowledge that their acts were forbidden by law. ch. 38, par. 4—3(c) provides:

"Knowledge that certain conduct constitutes an offense, or knowledge of the existence, meaning, or application of the statute defining an offense, is not an element of the offense *unless the statute clearly defines it as such.*" (Emphasis ours.)

See also Committee Comments, ch. 38, par. 4—3(c), Ill. Anno. Stat. From this we conclude that knowledge that the performance of the knowingly performed acts "is forbidden by law" is an element of the offense. The addition of the words to par. 33—3(b) "which he knows

he is forbidden by law to perform" negates the theory that every person is presumed to know the law, and requires an *allegation* and proof of a special knowledge on the part of those charged under par. 33—3(b). Here defendants causing attorneys to be paid in excess of the amount prescribed in ch. 42, par. 253, was an innocent act in absence of defendants knowing that ch. 42, par. 253 limited the amount of attorney fees they could pay. Where conduct alleged in an indictment may in itself be wholly innocent, it is essential that the unlawfulness of the conduct be averred either by express allegation or by the use of terms, or statement of facts, which clearly imply such unlawfulness. (41 A.Jur. 2d, Indictments and Informations, Sec. 109.) See also, *People v. Stewart* (No. 71—61 filed Dec. 21, 1971, 5th Dist.); *People v. Pronger* 48 Ill. App.2d 477, 199 N.E.2d 239; and *People v. Green,* 92 Ill.App.2d 201, 235 N.E.2d 295.

For these reasons we hold that Counts I, VI and VIII do not state an offense, are void, and judgment and conviction on them must be reversed. We therefore do not consider those three counts in the remaining issues.

Count IV charged that defendants, on December 8, 1969, intentionally failed to perform a mandatory duty as prescribed by law, in that they knowingly entered into a contract for work to be done and supplies to be furnished, the expense of which exceeded $4000 without letting the contract to the lowest bidder and without giving public notice as required by chapter 42, par. 269, Ill. Rev. Stat., contrary to the provisions of chapter 38, par. 33—3. Count V charged that defendants on January 29, 1970, committed the same act in the same language.

The appellants contend that the indictments were not sufficient to charge the appellants with an offense under Illinois law in that section 269 of chapter 42 is not a criminal statute. They cite *People v. Graf,* 93 Ill.App.2d 43, 235 N.E.2d 886, in which the court affirmed the trial court's dismissal of a complaint charging a violation of the Dram Shop Act. That case is inapplicable to the present case, since the argument in that case was that the Dram Shop Act was a penal statute, imposing criminal liability. In the present case, the indictments charged the appellants with violations of par. 33—3 of the Criminal Code of 1961. Section 269 of chapter 42 is only relevant in that it establishes specific mandatory duties. The failure to perform the duties becomes criminal only through section 33—3. The State has not argued that section 269 is itself a criminal statute which imposes liability.

In *Ketchum v. Bd. of Educ.* (1927), 324 Ill. 314, 155 N.E. 332, the Court stated that: "For the purpose of learning and giving effect to the legislative intention, all statutes relating to the same subject must

be compared and so construed with reference to each other that effect may be given to all the provisions of each, if it can be done by any fair and reasonable construction". *People ex rel. High School Dist. v. Hupe* (1954), 2 Ill.2d 434, 118 N.E.2d 328.

■■ Section 33—3(a) provides that a public official commits misconduct when, in his official capacity, he intentionally or recklessly fails to perform any "mandatory duty as required by law". By itself, without reference to other statutes, this section does not make criminal any specific act. It only receives its meaning by reference to other statutes. When deciding what are the mandatory duties, on the part of the appellants in this case, reference must be made to chapter 42, par. 247—274, the statute creating the appellants' district and defining the duties and the limitations of the trustees of that district.

There are no Illinois cases which have interpreted section 33—3(a) to assist in deciding what are mandatory duties, however, there are a number of cases interpreting the previous misconduct statute, ch. 38, par. 449, Ill. Rev. Stat. 1959, which made criminal "palpable omissions" of duties by "every person holding public office, trust, or employment".

In a very early case, *Eyman v. People* (1844), 6 Ill. 4, the Court reversed the convictions of the County Commissioners of St. Clair County for palpable omission of duty in office when they neglected to have a bridge repaired, basing its decision on the nature of the duty to be performed. The Court stated, at 8:

> "Before such a prosecution can be sustained, it must be shown that there was a palpable omission of a duty imperatively required by law, in a matter involving no discretion, or a wilful and corrupt, as well as palpable, neglect of a discretionary duty."

Similarly in *Summers v. People* (1903), 109 Ill.App. 430, the court reversed the convictions of the commissioners of highways of a county for diverting public funds for the building of a private road. The court held that the commissioners had made a decision involving the exercise of discretion and that their decision was not wilful or corrupt.

It would appear that the type of duty envisioned by section 449 was a ministerial, as opposed to a discretionary duty and that, if a discretionary duty was involved, there would have to be proof of a wilful neglect. A review of subsequent cases involving section 449 supports this analysis.

In *People v. Sleklinski*, (1960), 25 Ill.App.2d 233, 166 N.E.2d 469, the court affirmed the conviction of a chief of police for "wilful failure" to enforce the laws of the state against prostitution. The duties in this case would appear to be discretionary.

In *People v. Hughey* (1943), 382 Ill. 136, 47 N.E.2d 77, the Court

affirmed the conviction of a city commissioner for palpable omission to deposit a check in the city treasury, as required by statute. The Court stated, at 142:

"The rule is that when the public law enjoins on certain officers duties to be performed by them for the public, and they omit to perform them, they may be indicted, as, for example, under a former statute, supervisors of highways were required to repair public roads and the neglect to do so rendered them liable to be indicted under the act * * *."

Finally, in *People v. Gill* (1961), 30 Ill.App.2d 32, 173 N.E.2d 568, the court affirmed the conviction of the clerk of the Municipal Court of Chicago for the palpable omission of duties imposed upon him by statutes of Illinois. He failed to forward to the Secretary of State within three days after conviction the reports of conviction of persons driving while intoxicated, as required by the Motor Vehicle Law, and he failed to preserve quasi-criminal complaints (traffic tickets), as required by the Clerk of Courts Act. The indictments did not specify the criminal statute violated. But the court stated that there was no requirement to mention the specific statute since both section 449 of the Criminal Code and Section 9—22 of the Cities and Villages Act, which prohibit palpable omissions of duty by a municipal officer, "impose penalties for the omission of duties defined in other statutes", and since the defendant was sufficiently informed of the charges against him.

In the latter two cases, the duties which the defendants failed to perform were ministerial duties which had been created by statutory provisions other than the specific criminal statute imposing liability for the failure to perform. The courts had no difficulty finding that the failure to perform the statutory duties would render the defendant criminally liable.

With regard to the specific case dealing with the failure of public officials to follow a statutory requirement for public bidding, there do not appear to be any Illinois cases on point. However, there are cases from other jurisdictions. For example, in *Cargile v. State* (1942), 194 Ga. 20, 20 S.E.2d 416, the Supreme Court of Georgia, in answering questions certified to it by the intermediate appellate court, held that under a statute making criminal, malpractice in office, a county commissioner could be prosecuted for failing to let contracts to the lowest bidder, as required by statute.

There are also two New Jersey cases which have held that the common law crime of official misconduct in public office would include a public official who failed to follow a statutory requirement for public bidding. In *State v. Williamson* (1959), 54 N.J. Super. 170, 148 A.2d

610, aff'd. 31 N.J. 16, 155 A.2d 7, the court held that the trial court properly denied a motion to quash an indictment charging a city manager, under the common law offense of official misconduct, for awarding contracts without complying with the public bidding statute. The Court also cited *State v. Kern* (1889), 51 N.J.L. 259, 17A.114.

■■ From a review of these cases, then, it would appear that section 33—3(a) must be read together with those sections which impose duties with regard to public officials. Section 269 provides that all contracts for work in excess of $4000 shall be let to the lowest bidder. This is a mandatory duty upon the trustees of the district. Reading the statutes as a whole, section 269 does establish duties which can properly be considered in determining the content of Section 33—3(a).

■■ We therefore conclude that Counts IV and V were sufficient to charge offenses under the Illlinois Statutes.

Appellants contend that the prosecution failed to prove the intent necessary to constitute a crime and that the "judgment of the court is contrary to the manifest weight of the evidence", and that the prosecution failed to prove the defendants guilty beyond a reasonable doubt.

The contract of December 8, 1969, upon which Count IV is based, provided for the removal of silt deposits from two intake tunnels or conduits, located beneath the levee and in part beneath the Mississippi river. It provided for a unit price in excess of $75,000 and a 15% overhead and 10% profit. It was let without compliance with Chapter 42, Sec. 269, pursuant to minutes of a meeting on December 3, 1969, wherein a motion was adopted which provided:

"(T)hat a contract be let immediately to begin the tunnel work immediately, while the river is at low stage. This being an emergency project, it was agreed by the Board to let the contract without advertising for bids."

The Statutes under which the District was formed and operating (chapter 42, pars. 247 to 274 incl.) made no provision for action in event of emergency without compliance with Sec. 269, even though those statutes were solely for the protection of the health, safety and welfare of the citizenry and their property, and many types of municipal governments are empowered to act in times of emergency without resorting to the advertising for public bids. The record in this case leaves no doubt that these defendants mistakenly believed that they had such emergency powers.

The East St. Louis and Interurban Water Company, a private utility, owned four tunnels, including the two which were involved in the contract. All were located beneath the levee on the east bank of the Mississippi river. They had been constructed in 1912 and had never been

cleaned or inspected. They were so constructed that when the river stage rose above 6.5 feet on the St. Louis gauge they were flooded. The overall supervision for the construction and maintenance of the levees along the Mississippi river is under the United States Corps of Army Engineers. They in turn hold the Sanitary District responsible for that portion of the levee which lies within its corporate boundaries, including the tunnels or conduits owned by the Water Company. For many years the tunnels or conduits had been filled with debris and silt washed in by the flooding of the river. The only plans available to both the Corps and Horner & Shifrin, consulting engineers of the Sanitary District, were the original plans, no "as built" plans were available and for more than 10 years the Corps had questioned the structural adequacy of the tunnels and urged both defendant's predecessors in office and defendants to clean the tunnels so that an inspection of their condition could be made. The tunnels varied in length from 300 to 600 feet and being practically filled they could only be inspected from the ends. As a result no estimate of the cost of cleaning could be intelligently made.

As a result of the insistence of the Corps, cleaning the tunnels was considered by the Sanitary District in 1966. Horner and Shifrin wrote up a review of a proposal that the Water Company had procured through a New York City consultant on a method of remedy of the problems of the tunnels and of the proposals of the Corps with recommendations of their own. They did not constitute plans and specifications, and in proposing the review they had only the 1912 building plans and surface inspections, and according to the undisputed testimony of the owner of the firm who had participated and supervised the preparation of the review "we were primarily trying to settle the matter of what would be an acceptable method of correcting the difficulty and hopefully with the Water Company, Corps and Levee District". The plan proposed by the review involved cleaning by a hydraulic means, estimated a cost of $9000. From the record it is not clear whether that expense was the estimated cost of some structural changes, repairs or the cleaning. According to the undisputed testimony of the consulting engineer, it was contemplated that "there would be an opportunity to actually see the physical condition of the tunnels after they were cleaned, so we could inside (*sic*) to see them, and we have not, to attempt to update our estimate in the interim, since 1966". The witness, although his firm operated throughout the United States, as sanitary, water and river consultants, knew of no firm that would "do this sort of thing" and further testified that due to the lack of visible inspection it would not be possible to make an intelligent bid on the information available. The proposal was submitted to the Corps and the Water Company. Although

the Corps approved the proposal, the Water Company did not reply, although its representative had conferred with the consultants and Corps numerous times concerning the proposal. The Supervisor Structural Engineer of the Corps testified that repair plan evolving from the proposal, carried an estimate of $95,000, and that the Water Company objected to the plan.

The testimony is uncontradicted that there were only scattered times throughout the course of the year that the cleaning could be done, those times were unpredictable, and according to graphs made of the river stage during 1967, 1968 and 1969, that the months of December and January would be the best time to safely undertake the cleaning. Although the witness was not allowed to testify that the 1966 proposal was not realistic as determined after two of the tunnels had been cleaned, the only reasonable inference from his testimony is that it was not, and when the tunnels were eventually cleaned under the December 8, 1969, contract, the method proposed in the 1966 review was not used.

In 1967, as a result of the constant urging of the Corps, the defendants started an attempt to perform the cleaning by the use of their regular employees. After being driven out by the river on several occasions they abandoned the project in December 1967 after spending $18,000. Only a part of one tunnel had been cleaned. Again in 1968 and 1969 attempts were made to clean the tunnels and none were successful. In November of 1969 the Superintendent of construction of Eastgate Construction Company sought out the defendants and laid before them a plan to clean the tunnels. The evidence is undisputed that representatives of the Corps conferred with the trustees, the district engineer, and their consulting engineering firm both before, during and on completion of the cleaning and that both the Corps of Engineers and consulting engineer advised that there was an emergency, and that if the tunnels were left in their present condition through the next flood season they would be dangerous.

By cross examination of witnesses from the Corps of Engineers and the consulting engineer the State endeavored to minimize the emergency, and to show that it was practical to, in the absence of their being able to estimate the extent of the work and despite the unpredictability of how or when the work could be done, comply with par. 269. The consulting engineer testified positively that it was impossible to make an estimate and in view of unpredictability of the river, it was not possible to propose a proposal which could be let for bids or to give the notice required. No witness contradicted that testimony.

The cleaning of the two tunnels was commenced on December 10, 1969, and with men working in two 12 hour shifts, the cleaning was completed by January 22, 1970. The tunnels were inspected by the Corps,

and the defendants were advised that repairs had to be accomplished before the river rose and again entered the tunnels and possibly cause a collapse in the levee and damage to the area beyond. According to the evidence, once the tunnels had been cleaned, and the structures were no longer supported by the silt and debris, there was an immediate danger of collapse, particularly if they flooded. The consulting engineer had completed plans for the repair work by January 28, 1970, and testified that it would have required an additional three weeks to prepare plans and specifications for repairs which could be bid upon and that the 21 day publication would have meant that it would have been March 5, 1970, before bids would have been opened. On March 10 the river stage was 12.3 feet. The consulting engineer testified that contractors would require a reasonable length of time before they would start on such a job and that a contractor that was not mobilized for the job as Eastgate was, certainly could not have done the job in time. In was unquestionably in this atmosphere and on such advice of those experts that the defendants entered into the second contract which dealt with the immediate repair of the two cleaned tunnels, and which is the basis for the charges expressed in Count V.

 The State contends that there was no emergency because two of the four tunnels have never been cleaned or repaired, although all four were in the same condition when the first contract was entered into. They offered no witnesses who so testified, and while their cross examination of three experts was on this theory, it did not deprive the testimony of the engineers of credence, let alone fail to maintain the burden of proof. Even if it were to be concluded that the evidence did not prove an emergency existed the fact still remains that these defendants acted on the advice of experts that an emergency did exist, and were of the mistaken opinion that in such circumstances they had powers which they did not have. There is no question that their noncompliance with par. 269 was illegal; the question is whether their acts as charged in Counts IV and V makes them criminally responsible.

██ Chapter 38, par. 33—3(a) under which Counts IV and V were returned does not describe an offense which involves absolute liability. It provides that one charged must act "intentionally"; it prescribes a particular mental state to the offense as as whole. (See ch. 38, par. 4—3(a) and (b).) These two counts charged the defendants with acting "intentionally" and we note the provision of chapter 38, par. 4—4 which provides:

"A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the

offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct."

The State contends that since their conscious objective or purpose was to enter into the contracts without taking bids that their convictions must be sustained.

But here defendants' unrefuted evidence is to the effect that they acted through ignorance or mistake. The State has not shown that they profited from their illegal acts nor that their acts involved moral turpitude, nor are there any circumstances from which criminal intent can be inferred. Under ch. 38, par. 4—8(a) ignorance or mistake as to a matter of either fact or law is a defense if it negatives the existence of the mental state. Defendants are not contending that they have a defense under ch. 38, par. 4—8(b) and have made no showing under the four paragraphs of that section. ch. 38, par. 4—8(d) provides that a defense based upon "this section 4—8 is an affirmative defense", and applies to 4—8(a) as well as 4—8(b).

Chapter 38, par. 3—2(a) provides that the affirmative defense is raised by presentation of evidence thereon; defendants not only presented evidence of their acting under a mistake of law (that in an emergency bids were not required) but also presented a preponderance of evidence of the fact that an emergency existed. Ch. 38, par. 3—2(b) provides;

"If the issue involved in an affirmative defense is raised then the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense."

Here the State has failed to prove beyond a reasonable doubt that defendants were not acting in ignorance or mistake as to a matter of either fact or law. As a result the convictions of Counts IV and V cannot stand.

We therefore find it unnecessary to consider the numerous other issues; including the constitutional questions raised; and reverse the convictions of each of the defendants on each of the five counts.

Judgments reversed.

JONES and CREBS, JJ., concur.