FORREST R. CHANEY *et al.*, Plaintiffs-Appellees, *v.* THE DEPARTMENT OF LAW ENFORCEMENT *et al.*, Defendants-Appellants.

Fourth District No. 15151

Opinion filed August 2, 1979.

GREEN, J., concurring.
TRAPP, J., dissenting.

William J. Scott, Attorney General, of Chicago (Myra Turner, Assistant Attorney General, of counsel), for appellants.

Rogert G. Heckenkamp, of Heckenkamp and Simhauser, P. C., of Springfield, for appellees.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

The plaintiffs, Forrest Chaney and David Imber, were discharged from their jobs as agents for the Illinois Bureau of Investigation (IBI) based on a charge of insubordination for failing to obey an order of the superintendent. Following hearings on the discharge, a Civil Service Commission hearing officer found that the plaintiffs' discharges were merited. The Civil Service Commission adopted the findings of the hearing officer and concluded that the charge of insubordination had been proved and that the discharges were warranted. On administrative review, the circuit court of Sangamon County reversed the Commission's

decision on the grounds that the superintendent issued an unlawful order and that the agents had a right and duty to refuse to obey such order. The Civil Service Commission (Commission) and the Department of Law Enforcement (Department), defendants, appeal from the trial court's judgment and contend that the superintendent's order did not direct the plaintiffs to commit any illegal acts.

The facts are undisputed. In 1973, Peter Vaira, chief of the United States Department of Justice Strike Force in Chicago, approached IBI superintendent Kerstetter regarding the possibility of cooperative undercover projects by Federal and State agencies. Two projects were conceived: the operation of a tavern and the operation of a mercantile business by undercover agents. A memorandum of understanding regarding the undercover projects was signed by Kerstetter, Vaira, and Justin Doyle, special agent in charge of the alcohol, firearms and tobacco (ATF) Division of the United States Treasury. The objective of the project was "to expose [the law enforcement officers] to facts permitting criminal prosecutions in the industries involved for violations of the following criminal laws: Extortion, commercial bribery, payoffs to union representatives, loan sharking, tax evasion, merchandise thefts, receipt of stolen merchandise, police or other official corruption, firearms violations, gambling, prostitution, and violations of antitrust laws." A grant application on this basis was made and a Federal grant of $275,000 for the two projects was received.

Planning for the undercover tavern project, variously known as "Operation Suds," "Northside Project," and the "Organized Crime Project," began in mid-1974. At that time, IBI deputy superintendent, Robert Bullock, began the process of selecting IBI personnel to operate both the tavern and the other project. He selected plaintiffs Chaney and Imber. Neither had any undercover experience or special training or instruction in undercover work.

The plaintiffs were given an initial briefing on the two projects by Bullock and Kerstetter. The plaintiffs indicated that they preferred not to transfer to the Chicago area from their downstate locale. However, following an unsuccessful appeal to the Civil Service Commission on that question, the plaintiffs cooperated with their superiors in preparation for the project.

The plaintiffs arrived in Chicago in September of 1974 and selected assumed names for themselves and constructed "cover stories" drawing upon their own actual experiences. As part of their cover, the plaintiffs obtained several pieces of identification in their assumed names, Forrest Randall and David Scott: social security cards, drivers' licenses, firearms owners' cards, State fishing licenses, and baptismal certificates. The social security cards and firearms owners' cards were supplied to the plaintiffs

by the IBI and the other items of identification the plaintiffs obtained for themselves.

Plaintiff Chaney testified at the hearing before the hearing officer that he had raised questions about his civil and/or criminal liability arising from this project from the very beginning. Chaney was given a copy of the United States Attorney's letter assuring the plaintiffs that they would not be prosecuted for their activities. The letter was addressed to David Scott, David Imber's assumed identity, and stated that the "acquisition of" identification items, such as a driver's license, firearms identification card, and fishing license, would not be interpreted by Federal authorities as acts undertaken with intent to deceive or defraud any of the various agencies of the State of Illinois. The letter, however, went on to state: "This, however, does not relieve you of the normal and usual responsibilities and duties due to protect and uphold the United States constitution, the laws of the United States and of the several states, and your oath of office."

In addition to this letter, superintendent Kerstetter received a letter from a then Illinois Assistant Attorney General regarding the legality of the undercover operations. The pertinent portion of that letter stated: "It is my opinion that such concealment of identity and purpose, including concealment in oral conversation, in writing and on applications for license or employment, is lawful when the concealment is performed by State or Federal law enforcement officers during the pendency of an undercover operation with the express intent of securing evidence of violations of the criminal laws of Illinois under the circumstances described to me in the conference of June 21, 1974." Lawrence Casey, plaintiffs' supervisor, testified at the hearings that he had orally informed the plaintiffs that the Attorney General's office and the office of the State's Attorney of Cook County had given authorization to the project.

The plaintiffs thereafter were involved in selecting a site for the tavern operation, and the Borderline Tap in Calumet City was chosen and its selection was approved by officials from the IBI and ATF because of its location in Calumet City and its proximity to the State line. A corporation, Balmar, Inc., was formed. A private attorney in Chicago, who had been engaged by the IBI, performed the legal services. Plaintiffs acted as incorporators under their assumed names. The paper work required that the plaintiffs make false statements and that they subscribe to statements that could constitute the crime of perjury.

After the tavern was acquired, the plaintiffs applied for a liquor license. The application was made in their assumed names, but apparently no other false statements were made on the application. The plaintiffs met with the mayor of Calumet City, who was the local liquor control commissioner and who was involved in the licensing procedure.

They did not reveal their true identity to the mayor, and the mayor subsequently testified that he would not have issued a license had he known the true facts.

On the morning of April 15, 1975, the plaintiffs opened the Borderline Tap to the public. An ATF agent, Donald Roggenbauer, who was assigned to work in the tavern with the plaintiffs, was not present at the opening because he was attending a special training course in St. Louis. It was made very explicit that Roggenbauer was not to enter into any of the transactions previously mentioned, and neither his real or assumed name nor any signature should appear on any of the papers or documents involved. The Borderline Tap was busy and the plaintiffs operated the tavern for two days, tending bar and waiting on customers beginning at mid-morning each day, and continuing to the early hours of the following morning.

On April 17, the plaintiffs failed to reopen the tavern. Chaney advised a tavern employee that the reason for the closing was due to tax problems. The plaintiffs vacated their Calumet City apartment and went to the IBI offices in Chicago. There, they informed their supervisor that they would . not reopen the bar. They were directed to write statements of the situation, and in doing so, they detailed that they were most concerned about their physical safety and the legality of the project.

In an effort to remove the plaintiffs' fears, a series of three meetings was held on April 21, 23, and 25 in a motel in south suburban Chicago. Individuals present at those meetings were the plaintiffs, IBI personnel Kerstetter, Cooper, Casey, and Bullock, strike force chief Peter Vaira, ATF personnel Callaghan and Roggenbauer, Michael Murphy of the Attorney General's office, Kenneth Gillis and Joe Clapps from the Cook County State's Attorney's office, and Tony Gonzalas of the Internal Revenue Service. At these meetings, the plaintiffs raised a number of questions concerning the tavern operation, including security problems, their ability to deal with various unusual circumstances, and any possible civil or criminal liability to which they might be subjected. Plaintiffs were advised by Vaira and the representatives of the Attorney General's office and the State's Attorney's office that their actions performed in the scope of their employment in this project were not illegal. The plaintiffs were not satisfied with any of the answers or assurances given them, and plaintiff Chaney testified that he would have carried out the superintendent's order if he had assurances in writing that what he was doing was legal. However, such request for written assurances was refused. Since the plaintiffs were not satisfied with the explanations or assurances given them at these meetings, particularly with reference to immunity, they persisted in their desire not to return and operate the tavern.

On April 28, 1975, superintendent Kerstetter issued a formal order to the plaintiffs to return to the tavern and continue to operate it. After the plaintiffs refused to obey the order, they were charged with insubordination and subsequently discharged from the IBI.

On appeal the defendants contend that the superintendent's order did not direct the plaintiffs to commit any illegal acts and that the plaintiffs were obligated to obey the superintendent's order, after they were given official assurances, orally and in writing, that they were not violating the law.

Initially, it should be noted that all parties agree and our research confirms that there is no Illinois case in point. Cases cited by both parties from other jurisdictions are of some assistance, but are certainly not dispositive of this matter.

The defendants set forth several cases in their brief wherein courts have expressly approved undercover operations by police officers. (*Sorrells v. United States* (1932), 287 U.S. 435, 77 L. Ed. 413, 53 S. Ct. 210; *United States v. Russell* (1973), 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637; *Hampton v. United States* (1976), 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646.) Those cases do not deal with the issue presented here, but rather discuss the issue of entrapment that was presented in each case. In none of those cases was the question of the lawfulness of a superior officer's order to undercover agents raised.

The defendants cite two Ohio cases wherein the issue of the undercover officer's intent was raised in regard to violating a statutory provision. (*State v. Suchy* (1971), 31 Ohio Misc. 265, 277 N.E.2d 459; *State v. Rowan* (1972), 32 Ohio App. 2d 142, 288 N.E.2d 829.) In both cases, the court stated that the criminal intent required by the statutes was lacking and consequently the undercover agents or officers would not be guilty of any crimes in connection with their activities. In neither case was the precise issue of the legality of the superior officer's order raised by either the officers involved or the court.

The defendants argue that the plaintiffs' actions in opening and operating a tavern were not illegal due to the agents' lack of criminal intent. This is based on the rationale in *Suchy* and *Rowan*, as well as the criminal intent requirements in sections 4—4 through 4—7 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, pars. 4—4 through 4—7). This argument is certainly worthy of consideration, but as the trial judge correctly noted in his opinion: "The action of the agents in swearing falsely under oath, an act of perjury, is still an unlawful act in itself and not made lawful by the failure to prosecute or penalize for lack of criminal intent, or any other reason." Consequently, as the trial court correctly stated, the superintendent's order was unlawful even though the agents might not be prosecuted.

The plaintiffs submit that the case of *Garvin v. Chambers* (1924), 195

Cal. 212, 232 P. 696, which was cited with approval by the trial court in his opinion, is relevant to the instant case. In *Garvin*, a police officer was discharged for insubordination when he refused to talk to the chief of police without his attorney being present. The discharge, however, was overturned on review. The reversal was based on the grounds that at the time the police chief's order was given, the police officer was suspended from duty, and he could not be called upon to do police work nor be held amenable for a failure to do such duty. In reaching this result, the court stated, "Insubordination can be rightfully predicated only upon a refusal to obey some order which a superior officer is entitled to give and entitled to have obeyed." *Garvin*, 195 Cal. 212, 224, 232 P. 696, 701.

The plaintiffs candidly admit that the facts in *Garvin* are not the same as those in the instant case, but they argue that the above quoted portion of that opinion, which is also quoted by the trial court in its opinion, is pertinent and of some assistance in this case. Other cases have seized upon the above quoted language or similar language but, unfortunately, they are of little assistance in the case at bar. (*Sheehan v. Board of Police Commissioners* (1925), 197 Cal. 70, 239 P. 844; *Avery v. B & B Rental Toilets* (1976), 97 Idaho 611, 549 P.2d 270.) Although the facts in *Garvin* are distinguishable from those in this case, the proposition stated in the *Garvin* opinion is applicable here. The superintendent's order here directed the plaintiffs to violate several laws.

In this regard, it is interesting to note that an order dated November 18, 1972, established the policy and rules of conduct for personnel of the IBI. That order provided:

> "V. RULES OF CONDUCT
>    * * *
>
> C. Personnel will obey all orders from superior officers whether written or oral.
>> 1. Compliance with orders will not be required when compliance would require the commission of an illegal act."

In following the initial order of the superintendent to open and operate the tavern, the plaintiffs were required to commit forgery when they made application for the Calumet City liquor license under assumed names. (Ill. Rev. Stat. 1977, ch. 38, par. 17—3.) At the hearing before the hearing officer, the mayor of Calumet City testified that he would not have issued the license, as local liquor control commissioner, had he known the true facts. In addition, the plaintiffs were required to commit perjury when they applied under oath for the liquor license as well as when they applied under oath for the articles of incorporation of the tavern (Ill. Rev. Stat. 1977, ch. 38, par. 32—2). Additionally, the plaintiffs violated the Dramshop Act as well as the Calumet City ordinance, since

provisions in the Act and the ordinance prohibit any law enforcing public official from being interested in any way, directly or indirectly, in the manufacture, sale, or distribution of alcoholic liquor. Ill. Rev. Stat. 1977, ch. 43, par. 120(14).

A recent Illinois Supreme Court case sheds some light on undercover operations in the context of disciplining an attorney involved in those operations. (*In re Friedman* (1979), 76 Ill. 2d 392, 392 N.E.2d 1333.) In *Friedman*, an attorney in the Cook County State's Attorney's office was censured by the Disciplinary Review Board for deceiving a trial court for the purpose of developing evidence to be used in a subsequent prosecution. Chief Justice Goldenhersh, in an opinion, found the attorney's conduct unacceptable and noted that the integrity of the courtroom is so vital to the health of our legal system that no violation of that integrity, no matter what its motivation, can be condoned or ignored. The court noted the words of Mr. Justice Brandeis in *Olmstead v. United States* (1928), 277 U.S. 438, 72 L. Ed. 944, 48 S. Ct. 564 (dissenting opinion):

> "Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means— to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face." 277 U.S. 438, 485, 72 L. Ed. 944, 959-60, 48 S. Ct. 564.

■■ The referred-to opinion in *Friedman* concluded that the attorney's conduct was not justified. We find the reasoning there, as well as the quoted portion of the *Olmstead* opinion, to be applicable in the instant case. The ends of obtaining criminal convictions do not justify criminal conduct by governmental officials in order to obtain those convictions. In the case at bar, the plaintiffs had committed illegal acts in opening and operating the tavern, and they would have continued to commit illegal acts had they returned to the tavern and continued to operate it with an unlawful liquor license.

■■ ■ The order of the superintendent required the plaintiffs to commit illegal acts and the order further purported to require continuing illegal

conduct. It is illegal, and indeed totally inappropriate, that law enforcement officers be ordered to break the law. The total learning available to guide us in our conduct teaches that an illegal or immoral means cannot be utilized to reach a legal or "desirable" end. "To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution." (*Olmstead*, 277 U.S. 438, 485, 72 L. Ed. 944, 960, 48 S. Ct. 564, 575.) Surely we now know that such a cure is worse than the disease.

We find the defendants' argument that the plaintiffs were obligated to obey after having been given assurance that they were not violating the law to be without merit. An act that is illegal is still illegal even if committed pursuant to an order of the superintendent. The vague promises not to prosecute did not and indeed could not be equated with judicial immunity.

Mr. Justice Trapp, in his rather vigorous dissenting opinion, walks a long and tortuous mile to avoid rather than confront the issue. Illegal activity by government cannot be made permissible by characterizing the government agent as a person in a white hat, and the bad guys as coiffured in black. The fundamental issue here cannot be so cavalierly avoided. Speeders disappearing over the horizon would seem to be totally irrelevant. Rather, if, in dissent, it is thought that the ends justify the means, however illegal, such conclusion should be so stated. If illegal activity is "necessary" to law enforcement, then the legislature should be asked to validate such conduct. Until it does so, this court should not condone that which is illegal.

The rule here applicable provides that no employee shall be fired for failure to comply with an order if compliance would require the commission of an illegal act. The dissent seems to argue that all the illegal acts were completed and no more illegality was required, therefore, the firing can be a sanction for disobeying the order to reopen the tavern. Unfortunately, the dissenting opinion does not discuss the problem in the light of article X, section 1, of the Dramshop Act (Ill. Rev. Stat. 1977, ch. 43, par. 183), which provides that it is a criminal offense to operate a tavern without a valid license, or to obtain a license by making any false statement. That section further provides that each day any person engages in business as a distributor or retailer in violation of the provisions of the Act constitutes a separate offense.

This statutory proscription is sought to be avoided by the suggestion that the application for the license isn't in the record. While that does not persuade, there is in the record the application for the license from Calumet City, and the Calumet City ordinance is also in the record. That ordinance, like the State statute, contemplates the issuance of a license

and further provides that anyone who violates the ordinance commits an offense, and it is a separate offense for each day of violation. The ordinance further requires that the applicant for the license state name, age, and address, and specifically requires that a person who is not a legal resident of the city of Calumet City cannot have a license. A license is precluded to any law enforcing public official, and such official is not to have an interest direct or indirect in the license. It seems irrefutable that each day of operation would constitute a separate offense under the State statute and the ordinance.

Judgment affirmed.

Mr. JUSTICE GREEN, concurring.

I concur.

If the conduct required of plaintiffs in making various applications constituted perjury, that conduct had already occurred and those offenses had been committed before plaintiffs left the tavern. The order they are charged with disobeying required them to return to the tavern and operate it. No evidence was presented that this would require commission of perjury. However, as pointed out in the majority opinion, the ownership of the tavern operation had been structured in such a way that plaintiffs had an interest therein. As they were "law enforcing public official[s]" within the meaning of section 2 of article VI of the Dramshop Act (Ill. Rev. Stat. 1977, ch. 43, par. 120 (14)) (see *Bock v. Long* (1972), 3 Ill. App. 3d 691, 279 N.E.2d 464), their continued operation of the tavern would violate that statutory provision. Accordingly, I agree that they were being required to perform illegal acts.

Undercover operations are an accepted tool of law enforcement. I am concerned with our decision because of the effect it may have on law enforcement. The conduct required here does not concern the civil rights of others as in *Olmstead* nor the integrity of a judicial proceeding as in *Friedman*. Undoubtedly, the statutory provision in question was passed to prevent evils not involved here. However, unless legislation is enacted in aid of undercover operations, to permit this type of tavern ownership or additional otherwise illegal acts, IBI agents cannot be fired for refusal to perform those acts.

Mr. JUSTICE TRAPP, dissenting:

This record shows that the contention of plaintiffs that they lawfully refused to obey an unlawful order is specious in sum and in detail.

The position argued by plaintiffs and accepted by the majority

requires an initial assumption that it was unlawful to proceed under assumed names in procuring a liquor license and entering into the business of operating a tavern. From the days of the common law down to the present time that assumption is substantially erroneous.

27 Ill. L. & Prac. *Names* §3 (1956) states:

> "Without abandoning his real name, a person may, in the absence of statutory restrictions, adopt any name wholly or partly different from his own name by which he may transact business, execute contracts, and carry on his affairs. An adopted business name used by a party is equivalent in law to the actual name of the party, with respect to the effect of a contract entered into by the party by such adopted name."

In *Graham v. Eiszner* (1888), 28 Ill. App. 269, 273, it was said:

> "It is well settled that any person may adopt any name, style or signature over which he may transact business and issue negotiable paper and execute contracts, wholly different from his own name, and may sue and be sued by such name, style or signature."

The statutory proceeding for a change of name (Ill. Rev. Stat. 1977, ch. 96, par. 1 *et seq.*) is not exclusive but merely permissive, and the common law is not abrogated. (*Solomon v. Solomon* (1955), 5 Ill. App. 2d 297, 125 N.E.2d 675.) One may receive a municipal license under an assumed name. (*Charles Lenz & Sons v. Village of Lombard* (1963), 29 Ill. 2d 45, 193 N.E.2d 5.) Courts have recognized the validity of complaints for search warrant verified under an assumed name. *People v. Stansberry* (1971), 47 Ill. 2d 541, 268 N.E.2d 431; *People v. Rogers* (1978), 59 Ill. App. 3d 396, 375 N.E.2d 1009.

Plaintiffs argue, and the majority opinion perceives with horror, acts of perjury in the obtaining of a liquor license from Calumet City. It is not contended that any false facts were contained in the application but that, at most, the assumed names used by plaintiffs were signed to the application. In so far as the pertinent ordinances are contained in the record, one finds no provision concerning the "true" identity of the person making such application. So far as the ordinance and application provides an "applicant" may use a name as at common law.

Since the license was issued by Calumet City in the names of the corporation duly organized under the laws of the State of Illinois, there would appear to be no violation of section 4 of "An Act in relation to the use of an assumed name in the conduct or transaction of business in this State." (Ill. Rev. Stat. 1977, ch. 96, par. 7.) The Business Corporation Act, in sections 46-51 (Ill. Rev. Stat. 1977, ch. 32, pars. 157.46, 157.51), concerning the formation of a corporation, contains no provision forbidding the use of a name assumed as at common law. The majority

opinion concludes that there was a violation of the Dramshop Act. No document relevant to that issue appears to be included in the record and the conclusion is speculative.

In the context of plaintiffs' attempted justification for disobeying the order, the record is barren of any substantial evidence that the plaintiffs raised the issue of "legality" prior to their act of closing the tavern. Assuming that an illegal act existed, such had been committed prior to opening the tavern and was without substantial evidence of complaint or appeal by the plaintiffs. The written memoranda prepared by each plaintiff following the closing of the business do not mention the alleged violation of law in procuring the documents incident to opening the tavern. Rather, they speak of their complete respective cooperation in establishing and opening the business.

The testimony and the memoranda disclose the essence of the respective complaints to the senior officers made at the series of meetings following the unauthorized closing of the tavern and preceding the order to reopen it were directed to the "volatile" conditions in the business, the long hours required of the agents, and the apparent jeopardy which they encountered. They complain of the lack of agent support immediately at hand and their individual conclusions that the operation would not be successful. In short, they took over the management of the planned project.

There were subsidiary objections that the plaintiffs were not fulfilling their duties if they failed to make immediate arrests of persons carrying a gun or fighting in the premises. They were advised that their duty would be fulfilled if they reported the unlawful conduct to the prosecuting attorney for appropriate action. As stated in *Hoffa v. United States* (1966), 385 U.S. 293, 310, 17 L. Ed. 2d 374, 386, 87 S. Ct. 408, 417:

> "Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, * * *."

Defendants point out the provisions of section 4—8 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 4—8):

> "(a) A person's ignorance or mistake as to a matter of either fact or law, except as provided in Section 4—3(c) above, is a defense if it negatives the existence of the mental state which the statute prescribes with respect to an element of the offense.
>
> (b) A person's reasonable belief that his conduct does not constitute an offense is a defense if:
> * * *
>
> > (4) He acts in reliance upon an official interpretation of the statute, regulation or order defining the offense, made by a

public officer or agency legally authorized to interpret such statute."

The majority opinion notes that the plaintiffs, in meetings with senior law enforcement officials and representatives of the County and Federal prosecutors and of the Attorney General of the State, were advised that the activities presently asserted to be illegal were not illegal because such acts were done without criminal intent or intent to defraud. Such statutory defense was recognized in *People v. Campbell* (1972), 3 Ill. App. 3d 984, 279 N.E.2d 123, *appeal denied* (1972), 50 Ill. 2d 649.

Upon the actual issue, the record does not support a factual determination that the plaintiffs disobeyed because their acts were deemed illegal, but rather because they believed the operation ill-advised, hazardous and personally objectionable. In effect, they undertook to refuse their assignment for such reasons rather than for the reasons devised for purposes of the present action.

The closing comment of the majority opinion concerning "judicial immunity" does not seem relevant. One finds no provision for "judicial immunity" other than that provided in section 106—2 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 106—2), relating to a grant of immunity to a witness testifying before a grand jury or at trial.

In a society devoted to a "paper chase" of *malum prohibitum,* the over-extended sweep of views expressed in the majority opinion would swathe sophisticated and organized criminal activity with an impenetrable cover. In *Hoffa v. United States* (1966), 385 U.S. 293, 315, 17 L. Ed. 2d 374, 389, 87 S. Ct. 408, 420, Mr. Justice Warren, in his dissent, stated:

"At this late date in the annals of law enforcement, it seems to me that we cannot say either that every use of informers and undercover agents is proper or, on the other hand, that no uses are. There are some situations where the law could not adequately be enforced without the employment of some guile or misrepresentation of identity. A law enforcement officer performing his official duties cannot be required always to be in uniform or to wear his badge of authority on the lapel of his civilian clothing. Nor need he be required in all situations to proclaim himself an arm of the law. It blinks the realities of sophisticated, modern-day criminal activity and legitimate law enforcement practices to argue the contrary."

In requiring a law enforcement officer to always wear a "white hat," the sweeping pronouncement of the majority produces the scenario of a highway patrol car driven at 55 miles per hour steadfastly pursuing a

speeder disappearing over the horizon at 75 miles an hour. The product of the views expressed by the majority is that the penetration of secret and possibly "protected" criminal activity can be no more than superficial and transitory.

We are not here dealing with the integrity of a court within the context of the cited *In re Friedman.* The language of that opinion appears to refrain from comment upon the legality of the prosecutorial conduct considered and the ruling is upon a matter of professional ethics. Nor are we here concerned with an issue of the constitutional rights of an individual under the fourth and fifth amendments to the United States Constitution as in the eloquent dissent of Mr. Justice Brandeis in *Olmstead v. United States.*

Upon the conclusion that the contentions concerning the alleged illegality of the order disobeyed by plaintiffs are, in fact, a false issue, I would reverse the trial court.