THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT GREVER, Defendant-Appellant.

Second District    No. 2—03—0073

Opinion filed November 4, 2004.—Rehearing denied December 16, 2004.

McLAREN, J., specially concurring.

Robert P. Will, Jr., and Ralph A. Strathmann, both of Robert P. Will, Jr., & Associates, of Waukegan, and Gregory E. Pelini, of Law Office of Gregory E. Pelini, of Champaign, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz and Joan M. Kripke, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KAPALA delivered the opinion of the court:

Defendant, Robert Grever, a former township supervisor of Ela Township, Lake County, appeals from his eight convictions of official

misconduct (720 ILCS 5/33—3(a), (c) (West 1998)) in connection with a delinquent debt owed to the township for his mother-in-law's care at the county nursing home. We affirm in part and reverse in part.

## I. BACKGROUND

Defendant was charged by indictment with 12 counts of official misconduct. The first six counts, each pertaining to a different year from 1993 through 1998, charged that defendant:

"committed the offense of OFFICIAL MISCONDUCT, in that the said defendant, a public officer, the Ela Township Supervisor, while acting in his official capacity, intentionally failed to perform a mandatory act, in that he failed to inform the Ela Township Board of [the] [i]ndebtedness of Mae Chvojka and Ruth Grever to Ela Township for healthcare services provided by the Winchester House [and] paid for by Ela Township, within 30 days of the annual township meeting as required by 60 Illinois Compiled Statutes 1/70—15(c)(v), in violation of 720 ILCS 5/33—3(a) ***."

The next three counts of the indictment, each pertaining to a different person who benefitted from defendant's actions, charged that defendant:

"On or about 1992 through 1996, *** committed the offense of OFFICIAL MISCONDUCT, in that the said defendant, a public officer, the Ela Township Supervisor, while acting in his official capacity, with the intent to obtain a personal benefit for [Mae Chvojka (count VII), Ruth Grever (count VIII), and Robert Grever (count IX)], performed acts in excess of his lawful authority, in a series of acts designed to promote a single intent, he submitted bills to the Ela Township Board for payment by the township for the stay of Mae Chvojka at the Winchester House despite the fact that neither Mae Chvojka nor any representative on her behalf [was] reimbursing the township as required by Ela Township, in violation of 720 ILCS 5/33—3(c) ***."

The last three counts of the indictment, each pertaining to a different person who benefitted from defendant's actions, charged that defendant:

"On or about 1992 through 1998, *** committed the offense of OFFICIAL MISCONDUCT, in that the said defendant, a public officer, the Ela Township Supervisor, while acting in his official capacity, with the intent to obtain a person [sic] benefit to [Mae Chvojka (count X), Ruth Grever (count XI), and Robert Grever (count XII)], performed acts in excess of his official authority in a series of acts designated to promote a single intent, in that he concealed the existence of a debt owed by his wife, Ruth Grever, and her mother, Mae Chvojka, to Ela Township and withheld collection action regarding said debt, in violation of 720 ILCS 5/33—(c) ***."

Prior to trial, the court heard and denied defendant's motion to dismiss the indictment on the ground that the charges were barred by the statute of limitations. Defendant waived his right to a trial by jury and the matter proceeded to bench trial.

At trial, the State called the administrator of Winchester House, Steven Nussbaum. He explained that the Winchester House is a nursing home owned by Lake County that has been in operation for more than 150 years. Nussbaum became the administrator in 1997. Nussbaum identified the Lake County ordinance enacted in 1978 that authorized agreements between the County of Lake and the various townships of Lake County regarding Winchester House. That ordinance provided that the township supervisor of each township shall be responsible to pay the bills that township residents incurred at Winchester House. Nussbaum related that, pursuant to the ordinance, the various townships and Lake County had entered into agreements under which each township was assigned a number of beds at Winchester House proportionate to its population. Each township was thereby permitted to use Winchester House for its citizens. According to Nussbaum, when a bed of a particular township became available, Winchester House would notify that township's supervisor's secretary and ask that the next application be forwarded.

Nussbaum identified the amended agreement between the County of Lake and a former supervisor of Ela Township dated April 19, 1978. According to this agreement, the township supervisor of Ela Township agreed to be responsible for payment of all charges for patients admitted to Winchester House from Ela Township. Nussbaum testified that this agreement was terminated in December 1999 and a different procedure went into effect. However, the agreement was in force in 1991, and was still in effect in 1997 when he became administrator. Nussbaum explained that, under the agreement, Winchester House would send to each township supervisor a monthly bill indicating a total for that township's residents and an itemized bill for each private-pay resident. Each township, in turn, would send one monthly check to Winchester House.

According to Nussbaum, Mae Chvojka was an Ela Township citizen who became a resident at Winchester House on September 19, 1991. She remained at Winchester House until she died on December 12, 1996. Nussbaum identified a document authorizing Mae Chvojka's admission to Winchester House that was signed by defendant as Ela Township supervisor. That same document indicated that Ela Township would assume financial responsibility for Mae Chvojka's charges in accordance with the existing agreement between Ela Township and the County of Lake. The document also indicated that Winchester

House could submit the monthly bill for her care to the township supervisor. Other Winchester House records identified by Nussbaum indicate that Mae Chvojka was a private-pay patient, that Ruth Grever was responsible for her bills, that private-pay patients were billed for their care by the township supervisor's office, and that Ruth Grever's address was the billing address for Mae Chvojka's charges.

Nussbaum went on to identify a group exhibit consisting of the bills that were submitted to Ela Township regarding Mae Chvojka's care at Winchester House. The bills were admitted into evidence. Nussbaum testified further that if a township wanted someone removed from Winchester House because of nonpayment, the township supervisor would contact Winchester House. The only way Winchester House would know if a private-pay resident's bill was not being paid was through the township supervisor.

The State also called Margaret L. Staples, who testified that she served as defendant's secretary at Ela Township from 1985 to 2001. Staples said that she was familiar with the arrangement between Ela Township and Winchester House concerning Ela Township residents. Staples said that the policy of Ela Township was that the township would pay the bills for each township resident staying at Winchester House and that the township would then seek reimbursement. Staples opened the mail that came into the township supervisor's office. Winchester House would send Ela Township a monthly bill for private-pay Ela Township residents who were in Winchester House. Staples explained that the bill had a top sheet with the total charges for that month. In addition, there were three copies of each private-pay resident's bill that included the name and address of the party responsible for paying the bill. Staples would forward a copy of the bill to the responsible party and would place a copy of the total bill, as well as a copy of each individual bill, on defendant's desk. A copy of the total bill went to the township board meeting to be approved for payment. Staples testified that the board received only the total bill for all the Ela Township residents staying in Winchester House, not the individual residents' bills.

Staples testified further that after the Board approved the Winchester House bill, a check was drawn on the general assistance fund of the Ela Township treasury and sent to Winchester House. When payment came in from the responsible party, Staples would record the amount of the check and the check number, and make out a deposit slip for depositing the funds into the bank. Staples said that she had created a file for each private-pay Ela Township resident in Winchester House, and that the files were kept in a locked file cabinet. Staples recorded how much was paid on a form that was kept in each

resident's file. The form was available to Staples and defendant. Staples believed that these files were not available to the general public without a Freedom of Information Act (5 ILCS 140/1 *et seq.* (West 2000)) request.

Staples related that in August 1991, defendant's wife, Ruth Grever, took out an application to admit her mother, Mae Chvojka, to Winchester House. Staples processed the application and made a file for Chvojka. Chvojka went into Winchester House as a private-pay resident and was subject to the same terms and agreements as everyone else in Ela Township. Staples said that the record sheet she kept showed that Ruth Grever paid for Chvojka's first four months of care at Winchester House but that no payments were made after January 1992. Staples said that she processed the bills for Chvojka's care just like the rest of the bills and that the township board approved and paid her bill, along with the rest, each month. Staples continued to send the bills to Ruth. The township was not reimbursed for approximately $195,000 that it paid to Winchester House for Chvojka's care. According to Staples, in reference to his wife's failure to pay her mother's past-due bills, defendant said on several occasions, "I don't know what she's doing in regard to those bills." Defendant did not direct Staples to call Ruth and ask for the money or to take any action to collect the money. Staples said that she thought that Ruth would eventually pay the bill because Ruth would say to Staples from time to time, "I have to pay that." After Chvojka died and the bills for her care stopped coming from Winchester House, Staples did nothing to collect the debt from Ruth. The information regarding the outstanding bills, known only to Staples and defendant, just sat in Chvojka's file.

Ruth M. Grever testified that she married defendant in 1956. On September 19, 1991, Ruth's mother, Mae Chvojka, moved into Winchester House as a private-pay patient. Ruth agreed that she was handling her mother's financial affairs at that time and that, therefore, she was responsible for paying for her mother's care. Ruth said that she understood that the bills for her mother's care at Winchester House were to be paid by Ela Township and that she was responsible for reimbursing the township. At the time Chvojka moved into Winchester House, she had various assets including several bank accounts and complete ownership of her home. Ruth testified that she reimbursed the township for the first four Winchester House bills that the township paid on her mother's behalf. Thereafter, and through the time that her mother died, Ruth did not reimburse the township for the Winchester House bills the township paid on her mother's behalf. After her mother's death in December 1996, until the township filed a

lawsuit against her in September 1999, Ruth paid nothing toward the amount owed to Ela Township.

Ruth testified further that her mother had various bank accounts including a checking account into which approximately $7,500 in social security benefits were deposited annually. Ruth also said that her mother's house was sold in November 1993, netting proceeds of $97,000, of which $89,000 was deposited into her mother's checking account. Ruth took the remaining $8,000 in cash. Ruth said that she kept $500 of the $8,000 and may have given the remaining $7,500 to defendant. Ruth admitted that she spent in excess of $133,000 of her mother's money during the time that her mother was in Winchester House and after she died. Among those expenditures were various purchases of clothing for herself between October 1995 and October 1997 totaling $30,000. Ruth also testified to various expenditures for and on behalf of defendant including dining expenses, suits, clothing, golf items, paint for their home, a laptop computer for their home office, and their joint state and federal income tax liability.

According to Ruth, she contacted Staples in 1995 about the possibility of obtaining public aid. Defendant filed a petition for divorce in January 1999. In May 1999, Ruth revealed to her divorce lawyer the issue of the money owed to the township as a result of her mother's stay at Winchester House. Subsequently, Ruth was sued by Ela Township. Defendant's and Ruth's divorce became final in August 2000. After a trial in November 2001, a judgment was entered against Ruth and in favor of Ela Township in the amount of $133,000.

Ruth said that her mother went into Winchester House in mid-September 1991. Ruth received a bill in October and for the next three months she received a bill for the previous month's charges. Ruth paid all of those bills on behalf of her mother. According to Ruth, after the first four months she never received another bill from the township. Ruth explained that she did not get any of the mail that came to the house after January 1992. In the first part of 1992, when Ruth told Staples that she wanted to pay the bill, Staples told her that "[defendant] is the supervisor." Ruth brought the matter up several times per year and Staples would either say nothing or say "[defendant] is the supervisor." Ruth said that she never intended to leave the township unreimbursed for her mother's Winchester House bill. Ruth said she did not pay the bill when she went into defendant's office and saw Staples because she did not have her mother's checkbook. Ruth explained that after she wrote the four checks to Ela Township for her mother's care at Winchester House she no longer had custody of the checkbook for her mother's checking account. According to Ruth, defendant had the checkbook and would give Ruth blank checks

out of it periodically. This is how Ruth wrote all the checks on her mother's account totaling more than $133,000. Ruth testified that she often argued with defendant and asked him to let her pay her mother's bill to the township. Ruth denied ever telling defendant that she could spend her parents' money any way she wanted. Ruth also denied telling her daughter, Victoria, in 1999, that she had a plan to ruin defendant politically, professionally, and financially.

The State also called Lucy Prouti, who, at the time of her trial testimony, was the current Ela Township clerk. Prior to being elected as Ela Township clerk, Prouti served as an Ela Township trustee from 1991 to 2001. Prouti said that defendant was the Ela Township supervisor during the period that she served as a township trustee. According to Prouti, the township supervisor ran the day-to-day business of the township. Prouti explained that four township trustees, the township clerk, and the township supervisor were at the monthly township board meetings. At the board meetings the supervisor would bring in the township's bills and the trustees would go through them and vote to pay them. Prouti testified that when she voted on bills she relied on the supervisor's honesty with the board and the accuracy of all of the bills he submitted for payment. Prouti explained further that the township also held annual township meetings. Within 30 days of the township meeting, the supervisor provided a statement of the township's finances. When asked about Ela Township's policy regarding private-pay patients at Winchester House during the years in question here, Prouti said that Winchester House billed the township and the township would pay Winchester House. In turn, the township would bill the family of the private-pay patient and the family would reimburse the township.

Prouti testified further that it was the supervisor's duty to bring outstanding debts owed to the township to the attention of the township board. Prouti also said that the supervisor's job included consulting with the township attorney regarding the possibility of taking action to collect such debts and to bring possible litigation to the attention of the township board. According to Prouti, Ela Township did not give defendant the authority either to allow his family members to stay at Winchester House for free or to submit Winchester House bills to the township for payment for which the township was not being reimbursed. Prouti was not aware of any confidentiality policy that prohibited defendant from disclosing that someone was not reimbursing the township for a Winchester House bill.

Prouti explained that a board audit report was a list of all the bills that were accumulated during the month and that it served as a request that the bills be paid by the township. The township supervi-

sor, the township clerk, and the township trustees would sign the bottom of the audit report as having been audited and approved for payment. Prouti identified the township board audit reports for each month from September 1991 through March 1997. These documents contain an aggregate bill for the Ela Township residents in Winchester House and do not include the residents' names or their individual bills. Prouti also identified the township supervisor's annual statements of the financial affairs of the township. These supervisor's statements were filed within 30 days of each annual township meeting. The financial statements filed in 1992 through 1999 do not disclose the outstanding debt owed to the township by Ruth Grever for her mother's charges at Winchester House. Prouti also identified the minutes from the annual township meetings in 1993 through 1999, which show that defendant did not reveal to the township board his wife's outstanding debt to the township as a result of his mother-in-law's charges at Winchester House. Each month during these years the board voted to approve payment of the Winchester House bills for all the private-pay Ela Township residents staying at Winchester House. Prouti also identified the minutes from the township board meetings in 1991 through 1998, which show that defendant did not reveal to the township board his wife's outstanding debt to the township as a result of his mother-in-law's charges at Winchester House.

Prouti said that defendant did not reveal to the township board his wife's outstanding debt to the township until the August 1999 board meeting. At that meeting the board went into executive session and defendant told the board about his wife's delinquent payments owed to the township for the charges for her mother's care at Winchester House. A decision was made to seek a legal remedy for the debt against Ruth Grever and her mother's estate.

On cross-examination Prouti related that she has never seen the township's Winchester House billing policy in writing. To Prouti, "policy" is synonymous with "the way things are done." Prouti said that she does not remember the Ela Township board passing a single resolution from 1991 to 2000. Prouti said that she does not remember any trustee questioning a Winchester House bill that was submitted for payment.

William L. Donnan testified that he was an Ela Township trustee for 13 years beginning in 1981, and was the Ela Township clerk for the following 7 years. As such, Donnan said that he was at every township board meeting, except one, for 20 years. Donnan related that as trustee he relied on the township supervisor to provide him with accurate information regarding the township's bills. Donnan said that the township supervisor was responsible for communicating with the

township attorney and for bringing to the attention of the township board any possible litigation. Donnan testified further that before August 1999 defendant did not disclose to the township board that his wife, Ruth Grever, and his mother-in-law, Mae Chvojka, were not reimbursing the township for Chvojka's Winchester House bills. Prior to August 1999, defendant did not make such disclosure in any board audit report presented at the monthly township board meetings or in his annual supervisor's statement of the financial affairs of the township.

Richard Cowen testified that he became the attorney for Ela Township in 1981 and served as such until 2002. Cowen explained that the private-pay Winchester House patients' charges were paid by the township and the township was responsible for collecting from the person managing each patient's funds. According to Cowen, it was the supervisor's responsibility to bring to Cowen's attention any possible legal action or other issues concerning the township. Cowen said that if a person was not reimbursing the township for a Winchester House bill, he would know about it only if the supervisor notified him. If Cowen was made aware of such a situation, he would advise the township board as to its options for recovering the amount due. In March 1994, defendant wrote Cowen a letter regarding a Winchester House patient's representative who was not reimbursing the township for the patient's Winchester House bill. In the letter, defendant indicated that the amount due to the township was $8,773.07 and suggested that the township take action to attempt to collect the money. Cowen explained that in that case the patient had died and the amount due the township represented some four or five months of Winchester House services. Cowen related that the ultimate decision to file a lawsuit in such a case would be made by the township board. Cowen testified further that in July 1999, defendant first brought to his attention the fact that his wife, Ruth Grever, had not reimbursed Ela Township for the care of her mother for a number of years. Defendant told Cowen that his wife owed the township a couple of hundred thousand dollars, that she kept promising to pay but had not, and that they needed to consider legal action. Shortly thereafter, Cowen attended an Ela Township board meeting during which an executive session was called. During the executive session Cowen, by referring to the conversation he had with defendant, brought the matter to the attention of the board. The board authorized his filing a lawsuit against Ruth Grever for the amount due to the township.

Certified public accountant David Bark testified that he has performed the yearly audits for Ela Township since 1981. Bark explained that Ela Township was on a cash-receipts accounting system.

Bark identified the annual audits he prepared for the township from 1992 to 1999. Bark said that during that period defendant never informed him that his wife and mother-in-law owed Ela Township money for the mother-in-law's care at Winchester House. Bark first heard about the debt sometime during 1999 or 2000 while conducting the audit and talked to defendant about it in January or February 2001.

On cross-examination, Bark testified that the cash-receipts method of accounting is more prevalent among governmental bodies than is the accrual method. Bark explained that the cash-receipts method of accounting is a cash-in, cash-out system in that money received is reported as receipts and money paid out is reported as expenditures. Bark also explained that the modified accrual method reflects receivables and payables where the cash-receipts method does not. Bark said that the amount owed to the township for Mae Chvojka's stay at Winchester House would be considered an account receivable. According to Bark, under the cash-receipts method of accounting, an account receivable would not be reported until such time as it was paid. In Bark's audits of the township's financial records, he never saw listed any accounts receivable of any type. The annual audited financial statements of the township that he prepared contained no accounts receivable. According to Bark, the supervisor's annual statement of the financial affairs of the township show no accounts receivable, and that is consistent with the township's use of the cash-receipts accounting method.

Investigator Dean Kharasch of the Lake County State's Attorney's office testified that he interviewed defendant after his arrest in February 2002. According to Kharasch, when he asked defendant whether it was within his duties as township supervisor to notify the township board about anyone failing to make private-pay Winchester House payments to Ela Township, defendant said, "that's my job to let the board know." When Kharasch asked defendant why he waited so long to tell the township board about the outstanding debt, defendant said that he thought the money would be paid.

At the close of the State's evidence, defendant moved for a judgment of acquittal. The trial court denied that motion.

Defendant called Victoria Grever, who testified that she is defendant's and Ruth Grever's youngest daughter. In 1997 or 1998, Victoria overheard her parents arguing over the Winchester House bills. According to Victoria, defendant was pleading with Ruth to pay the bills. Ruth responded by saying that it was her parents' money, that she could do what she wanted with it, and that defendant should butt out. Ruth also said that she did not tell defendant what to do

with his parents' inheritance so she did not want defendant to tell her what she could or could not do with her inheritance. Victoria also testified that in June 1999, she had an argument with Ruth during which Ruth told Victoria that before she died she was going to find a way to ruin defendant professionally, politically, personally, and financially.

Defendant testified that he was Ela Township supervisor from 1981 to 2001. In the fall of 1991, his mother-in-law Mae Chvojka was admitted to Winchester House as a private-pay patient. At the time Chvojka was admitted into Winchester House, defendant was aware of various assets owned by Chvojka including her home, various bank accounts, and her income from social security and a pension. Defendant knew that Ela Township was reimbursed only for the first 4 Winchester bills that it paid on behalf of Chvojka during her approximately 64-month stay at Winchester House. Defendant said that he had no choice but to present the bills that came into the township to the township board for approval of payment. Defendant did not tell the township attorney about the outstanding bill until July 20, 1999. Defendant did not disclose the debt sooner because he believed and trusted that Ruth Grever would eventually pay the bill owed to the township. According to defendant, the supervisor's annual statement of the financial affairs of the township was generated by a computer program and did not include information regarding the nonpayment of the amount owed to the township for Chvojka's Winchester House care. Defendant admitted that it was the duty of the township supervisor and the township board to take legal action if the township was not being reimbursed for its payment of Winchester House bills on behalf of private-pay residents. Defendant also acknowledged that he was the only person who had knowledge of the outstanding debt due to the township for Chvojka's Winchester House care and that the members of the board would not know about it unless he told them. Defendant was aware that for $7\frac{1}{2}$ years the Ela Township board did not know about the debt owed to the township for Chvojka's Winchester House care. According to defendant, in the only other case where the township was not reimbursed for a private-pay Winchester House patient's bill, he sought legal action to collect an outstanding debt of approximately $8,000 for four months of care. At that same time, the outstanding debt due to the township for Chvojka's Winchester House care was almost $120,000.

The defense also called various character witnesses who testified that defendant's reputation in the community for honesty, integrity, truth, and veracity is excellent.

After hearing argument, the trial court found defendant guilty of

all 12 counts charged in the indictment. Defendant's posttrial motions, including motions for a new trial and in arrest of judgment, were heard and denied. Thereafter, the trial court entered judgments of conviction on the findings of guilt on counts I through VI, VII, and X of the indictment. The trial court sentenced defendant to a 30-month term of probation that included the payment of $205,000 restitution to Ela Township, six months of periodic imprisonment in the Lake County jail to be served on a work release basis, community service hours, and 90 days in the Lake County jail stayed pending defendant's compliance with the terms of probation. Defendant's motions to reconsider the sentence and to stay the sentence pending appeal were denied. Defendant now appeals.

## II. ANALYSIS

On appeal, with respect to counts I through VI of the indictment, defendant contends that the trial court erred in denying his motion for judgment of acquittal because the allegations in those counts fail to state offenses; because section 70—15(c)(v) of the Township Code (60 ILCS 1/70—15(c)(v) (West 1998)) is too ambiguous to supply the mandatory duty defendant was alleged to have failed to perform in those counts; and because the State failed to prove defendant guilty beyond a reasonable doubt of the offenses alleged in those counts. As to count VII of the indictment, defendant contends that the trial court erred in denying his motion for judgment of acquittal because the allegations in that count fail to state a criminal offense and because the State failed to prove defendant guilty of the offense beyond a reasonable doubt. As to count X of the indictment, defendant contends that the trial court erred in denying his motion for judgment of acquittal because the State failed to prove defendant guilty of the offense alleged therein beyond a reasonable doubt. Finally, defendant contends that the trial court erred in denying his motion to dismiss the indictment based upon the statute of limitations.

### A. Counts I through VI

#### 1. *Whether counts I through VI state offenses of official misconduct under section 33—3(a)*

Defendant's first contention on appeal is that the trial court erred in denying his motion for judgment of acquittal because counts I through VI fail to state offenses. The State argues that counts I through VI properly state offenses.

■ Defendant challenged the sufficiency of the charges alleged in counts I through VI in a posttrial motion in arrest of judgment, asserting that counts I through VI do not charge offenses punishable by

the criminal law of the State of Illinois. A motion in arrest of judgment shall be granted when the indictment does not charge an offense. 725 ILCS 5/116—2(b)(1) (West 1998). If the indictment fails to set forth the elements of the offense, then a motion in arrest of judgment, if made, must be granted by the trial court. *People v. Lutz,* 73 Ill. 2d 204, 211-12 (1978). If such a challenge to the indictment is made in a motion in arrest of judgment, the defendant need not show actual prejudice but may obtain relief if the indictment does not strictly adhere to the statutory and constitutional requirements. *People v. Wisslead,* 108 Ill. 2d 389, 394 (1985); *People v. Komes,* 319 Ill. App. 3d 830, 833 (2001) ("When the indictment is challenged in a posttrial motion, the indictment must set forth the nature and elements of the charge in order to be considered sufficient"). The United States Constitution and the Illinois Constitution afford criminal defendants the right to be informed of "the nature and cause" of the accusations against them. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. Section 111—3 of the Code of Criminal Procedure of 1963 requires that a charging instrument set forth "the nature and elements of the offense charged." 725 ILCS 5/111—3(a)(3) (West 1998).

■ Section 33—3(a) of the Criminal Code of 1961 (Code) provides:

"A public officer or employee commits misconduct when, in his official capacity, he commits any of the following acts:

(a) Intentionally or recklessly fails to perform any mandatory duty as required by law[.]" 720 ILCS 5/33—3(a) (West 1998).

In counts I through VI, the State alleged that defendant failed to perform the mandatory duty required by section 70—15(c)(v) of the Township Code (60 ILCS 1/70—15(c)(v) (West 1998)), in that he failed to inform the Ela Township board of the indebtedness of Mae Chvojka and Ruth Grever to Ela Township within 30 days of the annual township meeting. Section 70—15(c) provides:

"(c) The supervisor shall, within 30 days before the annual township meeting, prepare and file with the township clerk a full statement of the financial affairs of the township, showing (i) the balance (if any) received by the supervisor from his or her predecessor in office or from any other source; (ii) the amount of tax levied the preceding year for the payment of township indebtedness and charges; (iii) the amount collected and paid over to the supervisor as supervisor; (iv) the amount paid out by the supervisor and on what account, including any amount paid out on township indebtedness, specifying the nature and amount of the township indebtedness, the amount paid on the indebtedness, the amount paid on principal, and the amount paid on interest account; and (v) the amount and kind of all outstanding indebtedness due and unpaid, the amount and kind of indebtedness not yet due, and when the

indebtedness not yet due will mature. The township clerk shall record the statement in the record book of the township as soon as it is filed and shall post a copy of the statement at the place of holding the annual township meeting 2 days before the meeting is held. The clerk shall also read aloud the statement to the electors at the annual township meeting." 60 ILCS 1/70—15(c) (West 1998).

The parties disagree as to the meaning of the term "indebtedness" in section 70—15(c)(v) and, in turn, whether the failure to perform a mandatory duty required by law has been alleged in counts I through VI.

Defendant argues that section 70—15(c)(v) does not require the inclusion of the debt owed to the township in the annual financial statement because the term "indebtedness" used in that section means money owed by the township and not money owed to the township. Defendant, therefore, concludes that the facts alleged in counts I through VI fail to state offenses because the failure to include the debt owed to the township in the annual financial statement, even if true, does not, as a matter of law, constitute a violation of section 70—15(c)(v). In response, the State maintains that the plain meaning of the words "all outstanding indebtedness due and unpaid" in section 70—15(c)(v) is all monies owed by the township and all monies owed to the township and, therefore, it has properly stated a failure to perform a mandatory duty required by law in counts I through VI.

Defendant has presented an issue of statutory construction. Issues of statutory construction are questions of law subject to *de novo* review. *Lulay v. Lulay*, 193 Ill. 2d 455, 466 (2000). The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature. *Lulay*, 193 Ill. 2d at 466. The best evidence of legislative intent is the language employed in the statute itself, which must be given its plain and ordinary meaning. *Lulay*, 193 Ill. 2d at 466. The statute should be construed as a whole, with each section read in conjunction with every other section. *Lulay*, 193 Ill. 2d at 466. A court is not permitted to ignore the plain meaning of the statute by reading into it exceptions, limitations, or conditions that the legislature did not express. *Lulay*, 193 Ill. 2d at 466.

■ Applying these well-established principles to the statutory language at issue in this case, we conclude that the phrase "the amount and kind of all outstanding indebtedness due and unpaid" in section 70—15(c)(v) is unambiguous and means exactly what is written. This language means both the amount the township owes to others that is due and has not been paid and the amount that others owe to the township that is due and has not been paid. "Indebtedness" means the condition or state of owing money. Black's Law Dictionary

771 (7th ed. 1999). The fact that the legislature chose not to qualify the word "indebtedness" in subsection (v) to indicate by whom or to whom the indebtedness is owed, as was done in subsections (ii) and (iv) with use of the language "township indebtedness," evidences an intent to encompass in subsection (v) both indebtedness owed by the township and indebtedness owed to the township.

The defendant argues that construing the "all outstanding indebtedness" language in section subsection (v) to mean all indebtedness owed by and owed to the township is flawed from a definitional standpoint because "indebtedness," in common parlance, refers to amounts owed unless the context dictates otherwise. Defendant maintains that, when amounts owed are envisioned, the appropriate term is "accounts receivable." Defendant then points out that the legislature appreciates the difference between debts and accounts receivable and directs us to 28 statutory references to the term "account receivable." We agree with defendant's assertion that the legislature has manifested its awareness of the difference between debts and accounts receivable. However, the point ignored by defendant's argument is that the plain meaning of the words of the statute demonstrates that the legislature did not intend to limit the application of subsection (v) only to amounts owed to the township or only to amounts owed by the township and, therefore, did not use the term "accounts receivable" or "township indebtedness." Rather, it meant to encompass all types of indebtedness in subsection (v) and selected the language "all outstanding indebtedness," covering both amounts owed by the township and amounts owed to the township. The amounts owed to the township, accounts receivable for example, are one of the types of indebtedness that the supervisor must include in his full financial statement pursuant to subsection (v).

Defendant also argues that construing the "all outstanding indebtedness" language in subsection (v) to mean all indebtedness owed by and owed to the township flies in the face of applicable tenets of statutory construction by considering and defining "indebtedness" in isolation and divorced from its context. Defendant argues that in every instance, except in subsection (v), that the word "indebtedness" appears in section 70—15(c), it unquestionably relates to the indebtedness of the township and not to amounts owed to the township. Defendant cites *Guillen v. Potomac Insurance Co. of Illinois*, 203 Ill. 2d 141, 152 (2003) (dealing with the recurring appearance of the phrase "proof of mailing"), *Trettenero v. Police Pension Fund*, 268 Ill. App. 3d 58, 65 (1994) (dealing with the recurring appearance of the phrase "act of duty"), and other authorities for the principle of statutory construction that where the same words appear in different parts

of the same statute, they should be given the same meaning unless something in the context indicates that the legislature intended otherwise. We disagree. The above authorities are inapposite. The words "township indebtedness" appearing in the other subsections of section 70—15(c) are simply not the same words as "all outstanding indebtedness" used in subsection (v).

Defendant highlights *Kuznitsky v. Murphy*, 381 Ill. 182 (1942), which involved the construction of the word "day" in "An Act in relation to a system of unemployment compensation" (Ill. Rev. Stat. 1941, ch. 48, par. 217 *et seq.*). *Kuznitsky*, 381 Ill. at 183-84. *Kuznitsky* is simply a case where the unmodified use of the term "day" had about it no indication that the legislature did not mean what it stated earlier in the statute when it used the term "calendar day." *Kuznitsky*, 381 Ill. at 184-85. In contrast, the word "indebtedness" in section 70—15(c)(v) is not unmodified as was the word "day" in *Kuznitsky* but, in fact, has been modified differently than in the other subsections of section 70—15(c). More specifically, in the phrase "all outstanding indebtedness due and unpaid," the word "indebtedness" is modified by the words "all," "outstanding," "due," and "unpaid." As we have stated, use of the phrase "all outstanding indebtedness due and unpaid" indicates that a different meaning is intended than when the phrase "township indebtedness" is used.

Defendant's last argument with respect to the construction of the term "indebtedness" in subsection (v) is that the natural progression, after showing the amounts paid on township indebtedness as required by subsection (iv), is to show the remaining outstanding township indebtedness, not accounts receivable. We disagree. Among the township supervisor's duties are to receive and to pay out moneys raised in the township for defraying township charges. 60 ILCS 1/70—15(b) (West 1998). The supervisor has a duty to annually file a full statement of the financial affairs of the township. 60 ILCS 1/70—15(c) (West 1998). This financial statement must include, *inter alia*, the amount collected and paid to the supervisor (60 ILCS 1/70—15(c)(iii) (West 1998)) and the amount paid out by the supervisor (60 ILCS 1/70—15(c)(iv) (West 1998)). The amount paid to the supervisor, without question, includes amounts paid to the supervisor by a person or entity as a result of an obligation or debt owed to the township. The amount paid out by the supervisor specifically includes the amount paid out on township indebtedness (60 ILCS 1/70—15(c)(iv) (West 1998)), that is, amounts owed by the township. Accordingly, subsections (iii) and (iv) of section 70—15(c) require the township supervisor to show what he has collected on amounts owed to the township and what he has paid out on amounts the township owes to

others. In our view, after requiring the supervisor to show these amounts, the next logical requirement of a full statement of the financial affairs of the township would be to show the amounts that the township is yet due from other persons or entities and the amounts the township still owes on its own indebtedness. This is exactly what subsection (v) requires. In fact, from a logical perspective, it is defendant's construction of subsection (v) that is faulty. For section 70—15(c)(v) to require the township supervisor to prepare and file a *full statement* of the financial affairs of the township and not require that he show amounts owed to the township that are past due is absurd. A court must presume that the legislature, in enacting a statute, did not intend absurdity or injustice. *McNamee v. Federated Equipment & Supply Co.*, 181 Ill. 2d 415, 423-24 (1998).

Accordingly, we hold that section 70—15(c)(v) requires the township supervisor to include all debts owed to the township in his annual full statement of the financial affairs of the township. Hence, the allegations in counts I through VI of the indictment include an allegation that defendant failed to perform a mandatory duty required by law and, therefore, state offenses of official misconduct under section 33—3(a).

### 2. Whether section 70—15(c)(v) gives the supervisor fair warning as to what action is required

In counts I through VI defendant is charged with violations of section 33—3(a), which does not by itself make criminal any specific omission but must be read together with those laws that impose duties upon public officials (see *People v. Thoms*, 50 Ill. App. 3d 398, 402 (1977)). Defendant contends that the trial court erred in denying his motion for judgment of acquittal as to counts I through VI because section 70—15(c)(v) is too ambiguous to supply the mandatory duty defendant was alleged to have failed to perform. Defendant maintains that section 70—15(c)(v) fails to give fair warning to persons of common intelligence that accounts receivable must be included in the supervisor's annual financial statement. Consequently, defendant concludes that section 70—15(c)(v) did not give him fair warning that he had to include the amount owed to the township by Mae Chvojka and Ruth Grever in his annual financial statements.

■ A criminal law may be declared unconstitutionally vague where it fails to provide the kind of notice that would enable a person of ordinary intelligence to understand what conduct is prohibited. *People v. Law*, 202 Ill. 2d 578, 582 (2002). Where a criminal statute imposes an affirmative duty upon an individual to take action, the *actus reus* refers to a failure to act and the focus is on conduct that is required of

the individual. *Law*, 202 Ill. 2d at 583. Thus, in determining whether a statute is unconstitutionally vague, the proper inquiry is whether the statute gives fair warning as to what conduct is required. *Law*, 202 Ill. 2d at 583.

■ In support of his contention that section 70—15(c)(v) does not give him fair warning as to what conduct is required, namely, that he is to show the amounts owed to the township in his annual financial statement, defendant reiterates the statutory construction arguments that he made to support his first appellate contention. He asserts that it is counterintuitive to construe subsection (v) to impose such a duty. As noted above, we believe that the language "all outstanding indebtedness due and unpaid" is unambiguous and its plain meaning is any indebtedness, including that owed to the township. For the reasons stated in the previous section of this opinion, we hold that this language gives fair warning as to the conduct that is required.

Next, defendant maintains that the counterintuitiveness of construing subsection (v) to impose a duty to show outstanding amounts owed to the township on the financial statement is exacerbated in the context of Ela Township's use of a cash-basis system of accounting. Defendant defines a cash-basis system of accounting as that system of accounting wherein revenues are accounted for when received in cash and expenditures are accounted for when paid. Defendant maintains that under such an accounting system, revenues are not reflected when accrued like an account receivable but, rather, only when received. Defendant concludes that a public entity using a cash-basis system of accounting would not reflect accounts receivable in financial statements. We believe that the type of accounting system used by Ela Township is irrelevant to the issue of whether subsection (v) provides fair warning of the duty to show amounts due to the township on the full statement of the financial affairs of the township. Defendant equates a financial statement prepared for the township by its accountant under the cash-basis accounting system with the full financial statement he is required to file pursuant to section 70—15(c). The requirements and components of a cash-basis accounting system financial statement cannot alter what must be included in the full statement of the financial affairs of the township that the supervisor is required to file annually pursuant to section 70—15(c).

Based on the foregoing, we hold that section 70—15(c)(v) adequately provides the kind of notice that would enable a person of ordinary intelligence to understand what he must do. Therefore, a charge of official misconduct under section 33—3(a) predicated on a failure to perform the mandatory duty prescribed in section 70—15(c)(v) is not unconstitutionally vague.

### 3. Whether the evidence was sufficient to prove defendant guilty beyond a reasonable doubt

Defendant contends that the State failed to prove him guilty of the violations of section 33—3(a) alleged in counts I through VI because it failed to prove that he had knowledge or awareness of the mandatory duty imposed by section 70—15(c)(v) to include the outstanding debt owed to the township in the annual financial statement. Defendant's contention is specific. He submits that the offense of official misconduct under section 33—3(a) has an implied mental state of knowledge of the law imposing the mandatory duty that was not performed.

In support of his contention, defendant cites *People v. Campbell*, 3 Ill. App. 3d 984 (1972). In *Campbell*, the Fifth District reversed the defendants' convictions of official misconduct pursuant to section 33—3(a) because the State failed to prove beyond a reasonable doubt that the defendants were not acting in ignorance or mistake as to fact or law. *Campbell*, 3 Ill. App. 3d at 995. It was alleged that the defendants in *Campbell*, trustees of a levy and sanitation district, violated section 33—3(a) by knowingly entering into contracts without letting the contracts to the lowest bidder or giving notice to the public, in violation of state law. *Campbell*, 3 Ill. App. 3d at 988. The court said that there was no question that the defendants' acts were illegal, but found that the defendants' criminal responsibility was in doubt because the defendants acted on the advice of experts that an emergency existed and were of the mistaken opinion that in such circumstances they could enter into contracts without letting the contracts to the lowest bidder and without giving notice to the public. *Campbell*, 3 Ill. App. 3d at 994. The *Campbell* court held that section 33—3(a) "does not describe an offense which involves absolute liability. It provides that one charged must act 'intentionally'; it prescribes a particular mental state to the offense as [a] whole." *Campbell*, 3 Ill. App. 3d at 994. The court rejected the State's contention that the defendants' convictions must be sustained because the defendants' conscious objective or purpose was to enter into the contracts without taking bids. *Campbell*, 3 Ill. App. 3d at 995. The court reasoned that the unrefuted evidence showed that the defendants acted through ignorance or mistake, that the State did not show that the defendants profited from their illegal acts or that the acts involved moral turpitude, and that there were no circumstances from which criminal intent could be inferred. *Campbell*, 3 Ill. App. 3d at 995.

The State argues that defendant's contention fails in light of *People v. Scharlau*, 141 Ill. 2d 180 (1990). *Scharlau* involved, among other convictions, convictions of official misconduct under section 33—3(c)

(Ill. Rev. Stat. 1989, ch. 38, par. 33—3(c)). *Scharlau*, 141 Ill. 2d at 183. In *Scharlau*, our supreme court noted:

"[A] conviction under section 33—3 of the Criminal Code of 1961 requires only that the accused have an intent to obtain personal advantage for himself or another. [Citation.] Knowledge that the action in question violates the statute by being outside the officer's lawful authority is not an element." *Scharlau*, 141 Ill. 2d at 199.

The *Scharlau* decision alone does not dispose of defendant's argument regarding the mental state requirements of a charge under section 33—3(a); however, as explained below, the *Scharlau* decision is a component of our analysis of the issue defendant raises.

Section 33—3 provides in pertinent part:

"§ 33—3. Official Misconduct. A public officer or employee commits misconduct when, in his official capacity, he commits any of the following acts:

(a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or

(b) Knowingly performs an act which he knows he is forbidden by law to perform; or

(c) With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority; or

(d) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law." 720 ILCS 5/33—3(a) (West 1998).

The general provisions of section 33—3 require that the person charged be a "public official or employee" acting in his "official capacity." Subsection (a) adds two additional elements that must be proven by the State in order to sustain the charge. First, the *actus reus*, that is, the guilty act or omission, here the failure to perform some act. Second, the attendant circumstance, that is, a fact surrounding the act or omission, here that the act that was not done is a "mandatory duty required by law."

■ Criminal liability requires the conjunction of a culpable mental state (at common law, the *mens rea*) and a punishable act or omission (at common law, the *actus reus*). See 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.1, at 269-70 (1986). With the exception of certain absolute liability offenses, the Code (720 ILCS 5/1—1 *et seq.* (West 1998)) retains this distinction. Compare 720 ILCS 5/4—1 (West 1998) ("A material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing") with 720 ILCS 5/4—3(a) (West 1998) ("A person is not guilty of an offense, other than an offense which involves absolute liability, unless, with respect to each element described by the statute defining the offense,

he acts while having one of the mental states described in Sections 4—4 through 4—7"). We agree with the conclusion in *Campbell* that official misconduct under section 33—3(a) is not an absolute liability offense. The statute clearly requires proof of one of the two alternate mental states of intent and recklessness. 720 ILCS 5/33—3(a) (West 1998). The question raised by defendant is what mental state applies to the second component of section 33—3(a). More specifically, what mental state has to be proven with respect to the "attendant circumstance" that there is a "mandatory duty as required by law" that was not performed. It is on this point that we disagree with the *Campbell* court's position that section 33—3(a) prescribes a particular mental state to the offense as a whole.

■ Section 4—9 of the Code provides:

"§ 4—9 Absolute Liability. A person may be guilty of an offense without having, as to each element thereof, one of the mental states described in Sections 4—4 through 4—7 if the offense is a misdemeanor which is not punishable by incarceration or by a fine exceeding $500, or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described." 720 ILCS 5/4—9 (West 1998).

■ We believe that section 33—3, read as a whole, clearly indicates a legislative purpose to impose absolute liability as to the "attendant circumstance" element of subsection (a). In addition to the general elements of section 33—3, each subsection adds an *actus reus* in the form of an act or an omission, and an attendant circumstance in the form of a law prohibiting or requiring the act or omission. With regard to the mental states applicable to these attendant circumstances, subsections (b) and (d) expressly provide that the actor have knowledge of the law that prohibits the act he or she has knowingly performed. In contrast, subsections (a) and (c) have no express requirement that the actor or omitter have knowledge of the law that forbids or requires the act or omission. The legislature's provision of a mental state for the attendant circumstances in subsections (b) and (d), and not in subsections (a) and (c), is a clear indication of its purpose to impose absolute liability as to the attendant circumstances in subsections (a) and (c) but not in subsections (b) and (d). There is a well-established rule of statutory construction which states, "an express statutory requirement here, contrasted with statutory silence there, shows an intent to confine the requirement to the specified instance." *Field v. Mans*, 516 U.S. 59, 67, 133 L. Ed. 2d 351, 360, 116 S. Ct. 437, 442 (1995), citing *Gozlon-Peretz v. United States*, 498 U.S. 395, 404, 112 L. Ed. 2d 919, 930, 111 S. Ct. 840, 846-47 (1991), and quoting *Russello v. United States*, 464 U.S. 16, 23, 78 L. Ed. 2d 17, 24, 104 S. Ct. 296, 300

(1983) (" '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion' ").

Moreover, our determination that there is no implied mental state of knowledge as to the "mandatory duty required by law" element of section 33—3(a) is supported by our supreme court's holding in *Scharlau*. In *Scharlau* the court stated that in a prosecution for official misconduct under section 33—3(c), the State does not have to prove that the defendant knew that he was exceeding his lawful authority but only that he had the intent to obtain personal advantage for himself or another while performing an act in excess of his lawful authority. See *Scharlau*, 141 Ill. 2d at 199-200. We cannot conclude that subsection (a) of section 33—3 has an implied mental state of knowledge as to the attendant circumstance when our supreme court has held that there is no such mental state as to the attendant circumstance in subsection (c) of that section.

While the State was not required to prove defendant's knowledge of the law prescribing the mandatory duty, it is important to realize that proof of defendant's knowledge of the outstanding debt was essential to proving that defendant intentionally omitted the debt owed to the township in the full statements of the financial affairs of the township for the pertinent years. "A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct." 720 ILCS 5/4—4 (West 2002). In order to prove that it was defendant's conscious objective or purpose to omit the debt owed to the township from the full statements of the financial affairs of the township, the State had to prove that defendant knew about the debt owed to the township and chose not to include it in the statements. Had the State been unable to prove defendant's knowledge of the debt, it would not have been able to prove the alleged mental state of intent with respect to the omission. If defendant had never known about the outstanding debt, he would have been able to mount an ignorance or mistake defense because defendant's ignorance of the fact of the outstanding debt owed to the township would negative the existence of the intent mental state which section 33—3(a) prescribes with respect to the omission. See 720 ILCS 5/4—5(a) (West 2002). In this way the statute insulates inadvertent conduct from punishment as criminal conduct.

For these reasons, we reject defendant's contention that there is an implied mental state of knowledge as to the attendant circumstance element of section 33—3(a), and hold that the State is not required to

show that a defendant charged with official misconduct under section 33—3(a) was aware of the mandatory duty required by law in order to sustain a conviction. Hence, in this case the State did not have to prove beyond a reasonable doubt that defendant was aware of the section 70—15(c)(v) duty to include all debts owed to the township in his annual financial statement in order to sustain the charges alleged in counts I through VI of the indictment.

## B. Count VII

### 1. Whether count VII states the offense of official misconduct under section 33—3(c)

Defendant contends that the trial court erred in denying his motion for judgment of acquittal as to count VII of the indictment because the State failed to state a criminal offense in count VII. Specifically, defendant argues that the State has failed to sufficiently allege that he committed "an act in excess of lawful authority" because there is no "law" which limits his authority such that he can submit to the township board only bills that are being reimbursed. In response, the State contends that it has properly alleged a criminal offense in count VII and has sufficiently set forth the nature and elements of that charge. We need not decide if such a "law" exists; rather, we need only determine whether such a "law" must be pled in the indictment and, if so, whether that requirement was met in this case.

Defendant challenged the sufficiency of the charge alleged in count VII in a posttrial motion in arrest of judgment, asserting that count VII does not charge an offense punishable by the criminal law of the State of Illinois. A motion in arrest of judgment shall be granted when the indictment does not charge an offense. 725 ILCS 5/116—2(b)(1) (West 1998). If the indictment fails to set forth the elements of the offense, then a motion in arrest of judgment, if made, must be granted by the trial court. *Lutz*, 73 Ill. 2d at 212. If such a challenge to the indictment is made in a motion in arrest of judgment, the defendant need not show actual prejudice but may obtain relief if the indictment does not strictly adhere to the statutory and constitutional requirements. *Wisslead*, 108 Ill. 2d at 394; *Komes*, 319 Ill. App. 3d at 833 ("When the indictment is challenged in a posttrial motion, the indictment must set forth the nature and elements of the charge in order to be considered sufficient"). The United States Constitution and the Illinois Constitution afford criminal defendants the right to be informed of "the nature and cause" of the accusations against them. (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8.) Section 111—3 of the Code of Criminal Procedure of 1963 requires that a charging instrument set forth "the nature and elements of the offense charged." 725 ILCS 5/111—3(a)(3) (West 1998).

■ The official misconduct statute provides in relevant part: "Official Misconduct. A public officer or employee commits misconduct when, in his official capacity, he commits any of the following acts:

※ ※ ※

(c) With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority[.]" 720 ILCS 5/33—3(c) (West 1998).

In order to properly charge official misconduct under subsection (c) of section 33—3, the State must allege that a public officer or employee, in his official capacity and with intent to obtain a personal advantage for himself or another, knowingly performed an act in excess of his lawful authority. 720 ILCS 5/33—3(c) (West 1998); *People v. Bassett*, 169 Ill. App. 3d 232, 234-35 (1988). It is well established that "a charge of official misconduct under section 33—3 must specify the 'law' allegedly violated by the officer or employe[e] in the course of committing the offense." *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 506 (1991). "Law, in its generic sense, is a body of rules of action or conduct prescribed by controlling authority and having binding legal force." *People v. Samel*, 115 Ill. App. 3d 905, 911 (1983), citing Black's Law Dictionary 795 (5th ed. 1979). "Law" includes a civil or penal statute, supreme court rule, administrative rule or regulation, or tenet of professional responsibility. *Fellhauer*, 142 Ill. 2d at 506, citing *People v. Weber*, 133 Ill. App. 3d 686, 690-91 (1985). Accordingly, to properly state the offense of official misconduct the indictment must specify facts indicating a violation of an identifiable statute, rule, regulation, or tenet so as to demonstrate how a defendant exceeded his lawful authority. *Bassett*, 169 Ill. App. 3d at 235; *Weber*, 133 Ill. App. 3d at 689-91; *Samel*, 115 Ill. App. 3d at 911.

The State disagrees with defendant's position that, in order to plead "an act in excess of lawful authority," it must plead an act in excess of a rule of action or conduct, imposed with binding force of law by a controlling authority. In support of this argument the State cites *People v. Krause*, 241 Ill. App. 3d 394 (1993). In *Krause* the defendant was found guilty of official misconduct (Ill. Rev. Stat. 1991, ch. 38, par. 33—3(c)). The indictment charged that the defendant, in his official capacity as a deputy patrolman, with the intent to obtain personal advantage for himself, performed an act in excess of his lawful authority, in that he used the Law Enforcement Data System (LEADS), to request information on a person for the purpose of facilitating the offense of prostitution. *Krause*, 241 Ill. App. 3d at 396. On appeal the defendant contended, among other things, that the trial court erred in denying his motion to dismiss the indictment. *Krause*, 241 Ill. App. 3d

at 396. The defendant made three arguments in support of this contention, none of which was an argument that, by not specifying facts indicating a violation of an identifiable law, the State failed to allege the essential element that the defendant exceeded his lawful authority. See *Krause*, 241 Ill. App. 3d at 397-98. Because the defendant did not make such an argument, the court in *Krause* did not address the issue of the sufficiency of the allegations of "in excess of lawful authority." Consequently, *Krause* is not authority for the proposition that the State need not plead that an identifiable law was exceeded in order to state the "exceeding lawful authority" element of an official misconduct charge under section 33—3(c). Our supreme court has said, in no uncertain terms, that "a charge of official misconduct under section 33—3 must specify the 'law' allegedly violated by the officer or employer [*sic*] in the course of committing the offense." *Fellhauer*, 142 Ill. 2d at 506.

■ We have examined count VII of the indictment and have determined that the State failed to adequately charge the "exceeding lawful authority" element of the offense of official misconduct under section 33—3(c). The acts in excess of defendant's lawful authority that were alleged in count VII of the indictment were "submitt[ing] bills to the Ela Township Board for payment by the township for the stay of Mae Chvojka at the Winchester House despite the fact that neither Mae Chvojka nor any representative on her behalf were reimbursing the township as required by Ela Township." "As required by Ela Township" is not an allegation of facts showing that defendant exceeded his authority in contravention of an identifiable law. Because we find the allegations in count VII of the indictment insufficient to state a charge of official misconduct under section 33—3(c), we reverse defendant's conviction entered on the finding of guilt on count VII.

*2. Whether the evidence was sufficient to prove defendant guilty beyond a reasonable doubt*

We hold further that, irrespective of the sufficiency of the allegations in count VII of the indictment, the State failed to prove beyond a reasonable doubt at trial that defendant committed the offense of official misconduct alleged in count VII because the State failed to prove that defendant exceeded his authority by violating an identifiable law. The State is required to prove each element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 61 L. Ed. 2d 560, 571, 99 S. Ct. 2781, 2787 (1979). When a defendant contends that the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt, the reviewing court must determine whether, after viewing the evidence in a light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 49 (1989).

The State does not argue that defendant, in submitting to the township board bills for payment for which the township was not being reimbursed, violated any identifiable law promulgated by the State of Illinois, the County of Lake, Ela Township, or any other authority. Rather, the State argues that it is not required to prove that defendant violated an ordinance, resolution, rule, or regulation of Ela Township for defendant to be found guilty of the offense alleged in count VII. In other words, the State argues that it need not prove that defendant went beyond the authority granted him in some identifiable "law," as that term has been construed, in order to prove that defendant committed the offense of official misconduct under section 33—3(c). The State is incorrect. The State must plead and prove that a "law" was violated by the public officer or employee in order to sustain a charge of official misconduct. See *Fellhauer*, 142 Ill. 2d at 506. As we noted earlier, "[l]aw, in its generic sense, is a body of rules of action or conduct prescribed by controlling authority and having binding legal force." *Samel*, 115 Ill. App. 3d at 911, citing Black's Law Dictionary 795 (5th ed. 1979). "Law" includes civil or penal statute, supreme court rule, administrative rule or regulation, or tenet of professional responsibility. *Fellhauer*, 142 Ill. 2d at 506, citing *Weber*, 133 Ill. App. 3d at 690-91. The State failed to prove that there was some identifiable law prohibiting defendant from submitting Winchester House bills to the township board for payment when the township was not being reimbursed for its payment of those bills. As such, the State failed to prove one of the essential elements of the offense alleged in count VII and, therefore, no rational trier of fact could have found defendant guilty of that offense beyond a reasonable doubt.

## C. Count X

■ After having asserted in the trial court in his motion in arrest of judgment that the State failed to state an offense in count X of the indictment, defendant makes no such contention on appeal. Count X, like count VII, is lacking any allegation that defendant exceeded his lawful authority by exceeding or violating an identifiable law. Nevertheless, defendant does contend on appeal that the State failed to prove him guilty beyond a reasonable doubt of the offense alleged in count X. We agree.

Defendant argues that the State failed to prove an identifiable law indicating that he exceeded his lawful authority in concealing the outstanding debt owed to the township or in failing to take collection

action. The State asserts that defendant's argument fails in light of *Scharlau*, *Krause*, *People v. Lynn*, 223 Ill. App. 3d 688, 691 (1992), *Samel*, and *People v. Kleffman*, 90 Ill. App. 3d 1, 3 (1980). None of these decisions, however, is authority for the proposition that the State's burden to prove an act in excess of lawful authority under section 33—3(c) does not include a requirement that the State prove that an identifiable law was exceeded or violated.

*Scharlau* involved multiple defendants who were elected commissioners of the City of Danville at the time of the alleged offenses. *Scharlau*, 141 Ill. 2d 183. All the defendants were convicted of official misconduct (Ill. Rev. Stat. 1989, ch. 38, par. 33—3(c)) and of violating two statutes prohibiting municipal officials from having pecuniary interests in contracts involving the governmental unit they serve (Ill. Rev. Stat. 1989, ch. 24, par. 3—14—4(a); Ill. Rev. Stat. 1989, ch. 102, par. 3(a)). Although our supreme court's decision in *Scharlau* does not specify how the State alleged official misconduct, the appellate court opinion being reviewed in *Scharlau* indicates that the State alleged that the commissioners performed an act in excess of their lawful authority by negotiating a carryover provision which violated section 3—14—4(a) of the Illinois Municipal Code (Ill. Rev. Stat. 1987, ch. 24, par. 3—14—4(a)) and section 3(a) of the Corrupt Practices Act (Ill. Rev. Stat. 1987, ch. 102, par. 3(a)). See *People v. Scharlau*, 193 Ill. App. 3d 280, 283 (1990). More importantly, with respect to the sufficiency of proving an act in excess of lawful authority, our supreme court in *Scharlau* specifically stated that the two conflict of interest statutes (Ill. Rev. Stat. 1989, ch. 24, par. 3—14—4(a); Ill. Rev. Stat. 1989, ch. 102, par. 3(a)) defined the limits of the defendants' "lawful authority." *Scharlau*, 141 Ill. 2d at 197-98. Therefore, *Scharlau* does not hold that the State need not prove that an identifiable law was exceeded or violated in proving the "act in excess of lawful authority" element of official misconduct under section 33—3(c).

In addition to challenging the sufficiency of the indictment charging official misconduct under section 33—3(c), the defendant in *Krause* argued that he was not proven guilty of the offense beyond a reasonable doubt. *Krause*, 241 Ill. App. 3d at 396. This court determined that the State had established that the defendant was required to abide by various written rules of the Kendall County sheriff's department, including Rule 27, providing that sheriff's department facilities were to be used only for law enforcement purposes, and Rule 59, prohibiting the use of sheriff's department facilities for private gain and advantage. *Krause*, 241 Ill. App. 3d at 398. In finding the evidence sufficient to convict the defendant of a violation of section 33—3(c), this court determined that the defendant violated Rules 27 and 59. Accord-

ingly, *Krause* does not hold that the State need not prove that an identifiable law was exceeded or violated in proving the "act in excess of lawful authority" element under section 33—3(c).

*People v. Lynn*, 223 Ill. App. 3d 688, 691 (1992), involved a Department of Corrections employee accepting money and drugs in exchange for his delivering drugs to a prison inmate. *Lynn*, 223 Ill. App. 3d at 689-90. The defendant in *Lynn* was charged with official misconduct in violation of section 33—3(d), and the decision simply does not address the issue of whether the State's burden in proving the "act in excess of lawful authority" element under section 33—3(c) includes proof that an identifiable law was exceeded or violated.

In this court's decision in *Samel*, the defendant police officer was charged with official misconduct under sections 33—3(b) and 33—3(c) for his use of the Law Enforcement Data System (LEADS) for discovering the names and addresses of owners of vehicles to facilitate burglaries. *Samel*, 115 Ill. App. 3d at 907-08. Whether the State was required to demonstrate a violation of an identifiable law to sustain a charge of official misconduct under sections 33—3(b) and 33—3(c) was not at issue in *Samel*. Rather, the issue addressed in *Samel* was what type of law the State is required to show a violation of in order to sustain a conviction under those sections. The gist of our holding in *Samel* was that, in addition to violations of civil or penal statutes or supreme court rules, a violation of a rule or regulation properly promulgated by an administrative body may form the basis for prosecution under sections 33—3(b) and 33—3(c), and the violation of the administrative rule or regulation need not constitute a criminal offense in and of itself. *Samel*, 115 Ill. App. 3d at 911-12. Therefore, contrary to the State's assertion, *Samel* embraces rather than forsakes the requirement that the State prove that an identifiable law was exceeded or violated in order to establish the "act in excess of lawful authority" element of section 33—3(c).

In *Kleffman*, the Third District reversed the trial court's order dismissing an indictment charging that the defendant mayor committed official misconduct (Ill. Rev. Stat. 1979, ch. 38, par. 33—3(c)) by purchasing a weapon confiscated by the municipality's police department. *Kleffman*, 90 Ill. App. 3d at 2. As such, *Kleffman*, unlike defendant's focus here, is a case involving the sufficiency of the indictment, not the sufficiency of the evidence presented at trial. In the indictment the State alleged only that the defendant acted in excess of his lawful authority by purchasing a confiscated weapon held pursuant to law by the police department; the State failed to mention the law or rule that he exceeded. *Kleffman*, 90 Ill. App. 3d at 2. The *Kleffman* court rejected the defendant's contention that the indictment

failed to allege the element that the act be "in excess of his lawful authority." *Kleffman*, 90 Ill. App. 3d at 5-6. However, with respect to the State's prospects of proving a violation of a law at trial, the *Kleffman* court pointed out that, at the time of the alleged offense, section 24—6 of the Code (Ill. Rev. Stat. 1977, ch. 38, par. 24—6) prohibited the sale of firearms confiscated by law enforcement agencies. *Kleffman*, 90 Ill. App. 3d at 5-6. The *Kleffman* court noted that the defendant's participation in the prohibited transaction would clearly be an act in excess of the defendant's lawful authority. *Kleffman*, 90 Ill. App. 3d at 5-6. In our opinion this indicates that the *Kleffman* court recognized that the State would have to prove a violation of a specific law in order to demonstrate that an act was in excess of lawful authority.[1]

The State in fact concedes that there is no formalized rule or ordinance requiring defendant to institute collection action in the event of a delinquent debt to the township, yet it argues that there was ample evidence presented at trial which proved that defendant as township supervisor had such a duty. The State points to the testimony of the township attorney that it was the township supervisor's responsibility to bring to his attention any possible legal action and that the only person who could make him aware of an outstanding debt owed to the township was the supervisor. The State also highlights the fact that defendant called the township attorney's attention to another outstanding debt owed to the township for another person's Winchester House services. The State asserts that Lucy Prouti's testimony establishes that it was the township supervisor's job to bring outstanding debts to the attention of the township board and to consult with the township attorney regarding collection action. The State also points out that defendant admitted on cross-examination that if a private-pay resident of Winchester House fails to repay Ela Township, the township may have to take action to recoup the funds. Defendant also agreed that it was the duty of the supervisor and the township board to take legal action if it became necessary.

None of the foregoing evidence, however, proves that defendant acted in contravention of an identifiable law, that is, a rule of action or

---

[1]We also believe that, to the extent that *Kleffman* holds that the State is not required to state in the indictment facts indicating a violation of an identifiable law to show an act in excess of lawful authority, that holding has been contradicted in *Bassett*, 169 Ill. App. 3d at 235, *Samel*, 115 Ill. App. 3d at 911, and *Weber*, 133 Ill. App. 3d at 689-91, and overruled by *Fellhauer*, 142 Ill. 2d at 506. Accordingly, the holding in *Kleffman* does not alter our analysis of the sufficiency of the State's pleading in count VII.

conduct prescribed by a controlling authority, having binding legal force in the form of a constitution, statute, ordinance, supreme court rule, administrative rule or regulation, or tenet of professional responsibility, when he did the acts that were allegedly in excess of his lawful authority. As such, the State failed to prove one of the essential elements of the offense of official misconduct under section 33—3(c) and, therefore, no rational trier of fact could have found defendant guilty beyond a reasonable doubt of the offense alleged in count X. We do not need to determine whether there is a "law" granting defendant authority that he exceeded. We simply hold that no such law was proved in this case.

### D. Statute of Limitations

■ Before trial, the trial court conducted a hearing on defendant's motion to bar the prosecution based on the expiration of the applicable statute of limitations. At the hearing on defendant's motion Dean Kharasch, special investigator for the Lake County State's Attorney's office, testified that on March 17 or 18, 2001, Assistant State's Attorney Strickland and State's Attorney Waller assigned him to investigate a complaint from the public guardian's office regarding the Ela Township supervisor's failure to collect and enabling the theft of some $200,000. According to Kharasch, his investigation of the facts of the case concluded sometime after November 20, 2001, which was the date of the civil trial in the suit filed by Ela Township against Ruth Grever. At that trial, both defendant and Ruth Grever testified. After the trial, Kharasch consulted with Strickland and Waller, and the State's Attorney's office received a copy of the transcript of the trial, in December 2001. Defendant was indicted in February 2002. After hearing argument, the trial court denied defendant's motion.

Defendant contends that the trial court erred in denying his motion to dismiss the indictment based upon the statute of limitations because the evidence adduced at the hearing on his motion shows that the State became aware of the offense well before Kharasch was assigned to the matter in March 2001. Defendant concludes that the indictment issued in February 2002 was clearly filed beyond the one-year filing limitation after the discovery of the offense.

The offense of official misconduct is a Class 3 felony. 720 ILCS 5/33—3 (West 1998). Generally, the prosecution of a felony offense must be commenced within three years after the commission of the offense. 720 ILCS 5/3—5(b) (West 1998)). However, section 3—6(b) of the Code provides for an extended limitations period for charges such as those brought in this case:

"(b) A prosecution for any offense based upon misconduct in of-

fice by a public officer or employee may be commenced within one year after discovery of the offense by a person having a legal duty to report such offense, or in the absence of such discovery, within one year after the proper prosecuting officer becomes aware of the offense. However, in no such case is the period of limitation so extended more than 3 years beyond the expiration of the period otherwise applicable." 720 ILCS 5/3—6(b) (West 1998).

The one-year limitations period of section 3—6(b) is triggered by one of two events: when the offense is discovered by a person having a legal duty to report the offense; or in the absence of such discovery, when the proper prosecuting authority becomes aware of the offense. 720 ILCS 5/3—6(b) (West 1998). Defendant does not argue that there was a discovery of the offenses charged in this case, by a person with a legal duty to report the offenses, more than a year before the indictment was filed. Rather, defendant argues that "the evidence adduced at the hearing on the defendant's motion shows that the State became aware of the offense well before Strickland assigning [sic] the matter to investigator Kharasch in March 2001." By referring to the State's awareness, we assume that defendant is referencing the second triggering event in section 3—6(b) and means that the proper prosecuting officer became aware of the offense more than one year before the indictment was filed.

In response, the State cites *People v. McGreal*, 4 Ill. App. 3d 312 (1971), for its holding that the " 'discovery of the offense' mean[s] gaining knowledge of or finding out that a penal statute has been violated," and the proposition that, in order to discover something, knowledge, and not mere suspicion, is required. *McGreal*, 4 Ill. App. 3d at 321. The State concludes that once its investigation was concluded in December 2001, it gained the knowledge that defendant had committed an offense and indicted defendant two months later, well within the one-year limitations period.

The *McGreal* case is concerned with the first triggering event of the extended period of limitation under section 3—6(b) and construes the term "discovery." In this case, however, we are concerned with the second triggering event due to defendant's argument that the indictment was untimely because it was filed more than a year after the proper prosecuting officer became aware of the offense. The State's position is that in order for the proper prosecuting officer to be "aware" of the offense he has to have knowledge, not mere suspicion, that the defendant committed an offense. We do not know of any reported decision in this State construing the language "becomes aware of the offense" as used in section 3—6(b), nor have we been directed to such authority. Consequently, we are faced with an issue of

first impression. Issues of statutory construction are questions of law subject to *de novo* review. *Lulay*, 193 Ill. 2d at 466. The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature. *Lulay*, 193 Ill. 2d at 466. The best evidence of legislative intent is the language employed in the statute itself, which must be given its plain and ordinary meaning. *Lulay*, 193 Ill. 2d at 466.

Aware means "marked by realization, perception, or knowledge *** COGNIZANT." Webster's Third New International Dictionary 152 (1986). " 'Offense' means a violation of any penal statute of this State." 720 ILCS 5/2—12 (West 1998). Based on the foregoing tenets of statutory construction and definitions, we hold that, in order to become aware of the offense, the proper prosecuting authority must have knowledge of facts that he reasonably believes indicate that a person has violated a penal statute of this state. If the language "becomes aware of the offense" is construed to mean the time the proper prosecuting authority merely suspects that a crime may have been committed, then the prosecutor would in some instances be forced to file charges before he or she knows whether or not the charges are supported by probable cause. Such a course of action would violate Rule 3.8(b) of the Illinois Rules of Professional Conduct. 188 Ill. 2d R. 3.8(b). Moreover, it is unavoidably true that the outcome of some criminal investigations is a conclusion that no crime has been committed. One cannot be cognizant of an offense that does not exist.

At the hearing on defendant's motion to dismiss, the State produced sufficient evidence to show that officials in the Lake County State's Attorney's office did not become aware that defendant committed official misconduct until the investigation concluded in December 2001. Because the prosecution did not become aware of the offenses committed by defendant until December 2001, the charges in the February 2002 indictment were filed within one year after the proper prosecuting officer became aware of the offenses. This conclusion, however, does not end our analysis.

Section 3—6(b) also provides that "in no such case is the period of limitation so extended more than 3 years beyond the expiration of the period otherwise applicable." 720 ILCS 5/3—6(b) (West 1998). Thus, the longest period of limitations for the offense of official misconduct is six years (three years for the Class 3 felony (720 ILCS 5/3—5(b) (West 1998)) plus a three-year extension under section 3—6(b) because the offense is based upon misconduct in office by a public officer or employee (720 ILCS 5/3—6(b) (West 1998))). *People v. Stevens*, 66 Ill. App. 3d 138, 139 (1978).

In counts I through VI of the indictment it was alleged that defendant failed to include the debt owed to the township in his an-

nual statement of the financial affairs of the township that was filed 30 days before the annual township meeting held on the second Tuesday of April (see 60 ILCS 1/30—5(a) (West 1998)) in the years 1993, 1994, 1995, 1996, 1997, and 1998, respectively. In order to be filed within the applicable limitations period, the charges in counts I through VI had to be commenced within 6 years after the dates of the commission of the offenses which was in March of the respective years, that is, 30 days before the second Tuesday in April. The offenses charged in counts I, II, and III are alleged to have occurred in March 1993, 1994, and 1995, respectively. Six years from those dates are dates in March 1999, 2000, and 2001, respectively. Therefore, the charges of official misconduct in counts I, II, and III, filed on February 13, 2002, were not filed within the applicable limitations period. The offenses charged in counts IV, V, and VI are alleged to have occurred in March 1996, 1997, and 1998, respectively. Six years from those dates are dates in March 2002, 2003, and 2004, respectively. Therefore, the offenses of official misconduct in counts IV, V, and VI, filed on February 13, 2002, were filed within the applicable limitations period.

The State has argued that the offenses alleged in counts I, II, and III are within the applicable limitations period by virtue of section 3—8 of the Code, which provides:

"§ 3—8. Limitation on Offense Based on a Series of Acts. When an offense is based on a series of acts performed at different times, the period of limitation prescribed by this Article starts at the time when the last such act is committed." 720 ILCS 5/3—8 (West 1998).

We reject the State's argument because we do not find section 3—8 applicable to any one of the offenses charged in counts I through VI of the indictment. Section 3—8 sets the starting date for the period of limitations applicable to an *offense* based on a series of acts. None of the offenses of official misconduct alleged in counts I through VI are based on a series of acts; rather, they are each based on a specific act occurring on a specific date in March of a certain year. In contrast, the offenses charged in counts VII and X of the indictment are based on a series of acts, that is, the monthly submission of bills for payment by the township despite the lack of reimbursement, in 1992 through 1996, and the concealment of the debt and the withholding of collection action, in 1992 through 1998, respectively. Consequently, section 3—8 is applicable to those offenses and the applicable limitations period starts on the date of the last act, which is December 1996 and December 1998, respectively. Six years from a date in December 1996 and a date in December 1998 is a date in December 2002 and December 2004, respectively. Therefore, the charges of official misconduct alleged in counts VII and X of the indictment were filed within the applicable limitations period.

Based on the foregoing analysis we hold that the trial court erred in failing to dismiss the charges in counts I, II, and III of the indictment. Consequently, the convictions entered on the findings of guilt of the offenses alleged in those counts cannot stand.

## III. CONCLUSION

For the foregoing reasons, we reverse defendant's convictions of official misconduct based on the findings of guilt of the offenses alleged in counts I through III, VII, and X of the indictment. We affirm the convictions of official misconduct entered on the findings of guilt of the offenses alleged in counts IV through VI.

Affirmed in part and reversed in part.

GROMETER, J., concurs.

JUSTICE McLAREN, specially concurring:

Although I agree with the result the court reaches, I write separately to note my disagreement with the analysis used with respect to whether the State must prove knowledge of the mandatory duty to prove a charge of official misconduct under section 33—3(a). The majority answers this question in the negative by characterizing the mandatory duty element as providing absolute liability. I would also answer the question in the negative but believe the label of "absolute liability" is incorrect and unnecessary. The better answer to the question is that knowledge of an official's mandatory duty is presumed because of the deeply embedded principle of jurisprudence that ignorance of the law is no excuse. See *People v. Izzo*, 195 Ill. 2d 109, 115 (2001). Defendant's argument that the State is required to prove that he knew that he had a mandatory duty is like a speeder arguing that the State must prove that he knew the speed limit. Of course, the State is not required to prove that a speeder knew it was against the law to speed, because we are all presumed to know the law. Just like defendant in this case is presumed to know the law. Now, if the speeder says that he is not guilty because he did not intend to speed, the response would be that *mens rea* is not an element of the offense because speeding is an absolute liability offense. But that argument is different from arguing that the speeder did not know there was a law providing for maximum speed limits. Like the mandatory duty element in this case, the State is not required to prove that the speeder knew of the existence of the law.

Allowing defendant to frame the issue, the majority mistakenly discusses whether the mandatory duty element requires a mental

state. However, defendant's mental state cannot be the issue because he is presumed to know the law, that is, he is presumed to know his mandatory duties as defined by the legislature.

Defendant essentially claims that ignorance of the law is an excuse. However, defendant was aware of the law but claims he misinterpreted it. Neither *Campbell* nor any authority of which I am aware allows a defendant to act under a law repeatedly and later claim that he is not guilty based upon an unreasonable interpretation of the law. The State proved that defendant was aware of the law and failed to act according to its clear and unambiguous mandate. I submit the surrounding facts and circumstances, when viewed in the best light of the prosecution's position, sustain defendant's convictions. Despite defendant's contention that he lacked intent based upon his unreasonable interpretation, a trier of fact could have determined that defendant knew he had a duty and failed to perform it. In this case, the State is not required to prove a mental state because the attendant circumstances that the State must prove have little or nothing to do with intent. Rather, they have to do with the clear and unambiguous language of the statute and what it requires or proscribes. The State has not only proven what the statute clearly requires, it has also successfully refuted defendant's interpretation of the statute. The State was not required to disprove defendant's claimed knowledge of the law prescribing the mandatory duty.

The majority's assertion that the legislature intended absolute liability is not borne out by the language of the statute and the long-settled rules of statutory construction. Absent either a clear indication that the legislature intended to impose absolute liability or an important public policy favoring it, our supreme court has been unwilling to interpret a statute as creating an absolute liability offense. *People v. O'Brien*, 197 Ill. 2d 88, 92 (2001). The penalty for a violation of a statute is an important factor in determining whether the legislature intended to impose absolute liability. *Lawrence v. Regent Realty Group, Inc.*, 197 Ill. 2d 1, 21 (2001). The legislature has provided that an offense that "is a misdemeanor which is not punishable by incarceration or by a fine exceeding $500 *** clearly indicates a legislative purpose to impose absolute liability for the conduct described." 720 ILCS 5/4—9 (West 1998). Conversely, where the penalty is severe, the likelihood of a legislative intent to impose absolute liability is reduced. *O'Brien*, 197 Ill. 2d at 94. A violation of the statute at issue in this case, section 33—3, is a Class 3 felony carrying a penalty of two to five years' imprisonment. See 720 ILCS 5/33—3 (West 1998); 730 ILCS 5/5—8—1 (West 1998). Given the gravity of the penalty and the lack of clear language indicating an intent

to impose absolute liability on the attendant circumstances, I cannot agree with the majority's interpretation.

In addition, the majority's citation to *Scharlau* to support its position is puzzling because the majority's analysis is not in accord with our supreme court in *Scharlau*. In *Scharlau* our supreme court analyzed section 33—3(c) and held that knowledge of the attendant circumstance is not an element of the offense. *Scharlau*, 141 Ill. 2d at 199. What is noticeably absent from the supreme court's analysis is the label "absolute liability." I assert that the supreme court avoided that label because it does not accurately describe the legislative intent as indicated by the language of the statute. Rather than using the label "absolute liability," I would hold as the supreme court did, that knowledge is simply not an element of proving the attendant circumstance. See *Scharlau*, 141 Ill. 2d at 199.

In conclusion, I submit that my interpretation allows for exoneration based upon a mistake of fact, assuming *arguendo* that *mens rea* was a part of the attendant circumstance/mandatory duty. My interpretation as stated above does not allow for exoneration based upon a mistake of law. The majority interpretation would not allow exoneration based upon a mistake of fact or of law, assuming *arguendo* that *mens rea* was a part of the attendant circumstance/mandatory duty. See analogically *People v. Becker*, 179 Ill. App. 446, 453 (1913), quoting *McGuire v. State*, 26 Tenn. (7 Hum.) 54, 56 (1846) (" 'If the voter believe himself to be twenty-one years of age, when he is not, and vote, he does not know of the existence of the disqualifying fact and may, on that ground, be excused. But, if he knew that he is only twenty years of age, yet believes he is old enough in point of law to vote, such ignorance of the law will not excuse him' "). The majority would not allow the former defense. I would; therefore, I specially concur.